(text box: 1) NO. 5-01-0666

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellee, )  Madison County.

)

v. )  No. 97-CF-2278

)

CHESTER O'QUINN, )  Honorable 

)  Charles V. Romani, Jr., 

Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE DONOVAN delivered the opinion of the court:

Following a jury trial in Madison County, the defendant, Chester O'Quinn (defendant), was found guilty of first-degree murder and sentenced to an extended term of 70 years' imprisonment.  On appeal to this court, defendant argues that (1) he was denied the effective assistance of counsel and a speedy trial when defense counsel continued his trial for more than 3½ years, (2) he was denied his right to a fair trial when the circuit court removed him from the courtroom, (3) the use of a special interrogatory to determine the victim's age constituted a violation of the constitutional prohibition against 
ex post facto
 laws, (4) he was denied a fair trial when he repeatedly complained that defense counsel was not providing adequate representation and the court did not make a sufficient inquiry into defendant's claims or appoint new counsel to represent him at the hearing on the posttrial motion, and (5) he was denied the effective assistance of counsel when counsel filed a 
pro forma
 motion to reduce sentence on the same day that the sentence was imposed.  For the following reasons, we affirm.

BACKGROUND

On October 31, 1997, the State filed an information charging defendant with one count of first-degree murder for the death of 13-month-old Emmarld Bradley.  Defendant filed a demand for a speedy trial on November 5, 1997, and on November 13, 1997, he was indicted for three counts of first-degree murder.  Over the next 3½ years, defendant's trial was continued as a result of defense counsel's motions to continue.  Defendant's case went to trial on April 2, 2001.  The jury returned its guilty verdict on April 6, 2001, after deliberating for less than two hours. 

During the course of the trial, the State presented a detailed circumstantial case leading up to Emmarld's death on October 28, 1997.  Emmarld was born on September 19, 1996.  Her mother was Twuna Jackson and her father was Larry Bradley.  After Emmarld's birth, Twuna and Larry separated.  Twuna met defendant in the summer of 1997.  In August of 1997, Twuna and defendant moved into an apartment in Wood River.  Residing in the apartment with Twuna and defendant were Twuna's two children, Kiera, 3 years old, and Emmarld, 11 months old, and defendant's son Adontay, 7 years old.

Emmarld was a healthy, thriving child prior to August of 1997, when she, her sister, and her mother moved in with defendant.  Dr. Alison Nash was Emmarld's pediatrician.  Emmarld's first office visit, or checkup, took place on October 18, 1996, and her last was on July 29, 1997.  During this period, Emmarld was seen by the doctor for each of her "well-baby" checkups, which took place two months, four months, six months, and nine months after her birth, and for several interim visits for an ear infection and diaper rash.  On her last visit the doctor did not find any problems other than a rash that she believed was related to the soap used in Emmarld's bubble bath.  Emmarld's body did not show any indication of marks, bruises, or burns.

Roxanne Harvey, Emmarld's maternal grandmother, lives in Texas, but she returned to Illinois to care for Emmarld and her sister during the first week of August 1997, to allow Twuna to move into the apartment in Wood River with defendant.  Ms. Harvey and the children stayed with her mother in Florissant, Missouri.  Ms. Harvey described Emmarld as smiling and giggling a lot and wanting to be everywhere that her big sister wanted to be.  Emmarld did not have any marks, bruises, or burns.  Ms. Harvey returned from Texas to visit her family during the weekend of October 24 to 26.  Emmarld was thinner.  She was solemn.  Her eyes were dark and sunken.  She had a couple of bruises on her cheeks and a faint bruise on her forehead.  

On October 27, Twuna was scheduled to work the 5:30 p.m.-to-11 p.m. shift at her job in St. Charles, Missouri.  She left for work at 4 p.m.  Prior to leaving for work, she checked on her baby daughter.  Emmarld was lying in her bed.  She opened her eyes when her mother kissed her and then closed them and went back to sleep.  Emmarld's forehead was not bruised and she had no marks on her neck.  Twuna denied ever physically abusing her daughter.

At 4:59 p.m. on October 27, the Wood River police department received a 9-1-1 call regarding a child that was not breathing.  Officer Otis Steward arrived at the front door of defendant's apartment at 5 p.m.  Emmarld was lying on her back on a bed.  She was wearing a diaper.  Her breathing was labored, she had a large bruise on her forehead, and a purplish knot was forming on her forehead.  Officer Steward carried Emmarld to the waiting ambulance and rode with her to the Wood River Township Hospital, which was only a short distance away.  

Officer Steward spoke with defendant at the hospital.  Defendant told him that he woke up Emmarld.  He held her hand and walked with her into the kitchen, where she fell and lay on the floor.  He went into the other room to get Adontay and Kiera for supper.  When he walked back into the kitchen, Emmarld was still lying facedown on the kitchen floor, and he thought she was sleeping.  When he picked her up, he noticed she was not breathing.  He tried to "give her breaths" and then told Adontay to call 9-1-1.

Emmarld arrived at Wood River Township Hospital at 5:10 p.m.  She was totally unresponsive to touch, pain, and light.  The emergency room physician attempted to stabilize her and made arrangements to have her transferred to a children's hospital in St. Louis.  At 6:46 p.m. Emmarld was taken by helicopter to Cardinal Glennon Children's Hospital in St. Louis (hereinafter referred to as Cardinal Glennon).

Dr. Anthony Scalzo treated Emmarld at Cardinal Glennon.  Dr. Scalzo is board certified in pediatrics and in pediatric emergency medicine.  He observed extensive bruising on her forehead in the shape of two overlapping rough circles.  A CAT scan showed multiple pockets of bleeding in the front part of the brain, which was anatomically close to forehead injuries, and bleeding in the center of the brain, which was diagnosed as a subarachnoid hemorrhage.  The neurological exam indicated that Emmarld was brain dead.  She did not have any reaction to light in her eyes.  She had no gag reflex and she did not respond to any stimulus.  Further tests indicated she had no flow of blood within the brain, which confirmed the brain death diagnosis.  Dr. Scalzo testified that the condition was caused by multiple nonaccidental shearing forces consistent with shaken infant syndrome.  He believed that the bruising to the forehead and the hemorrhages on the brain were fresh, and he stated, "A child with this extent of injury would go unconscious probably instantaneously or [within] minutes at the very most."

Dr. Bradley Davitt, a pediatric opthamologist, examined Emmarld on October 28 at 8:35 a.m.  He found that Emmarld's retina in each eye was detached from the eye wall and that there were multiple layers of hemorrhage in each eye.  He diagnosed the cause as nonaccidental trauma, or abuse.

Emmarld was pronounced dead at approximately 11:30 a.m. on October 28.  At 12 p.m. she was examined by Dr. James Monteleone.  Dr. Monteleone was a professor of pediatrics and gynecology at St. Louis University School of Medicine and the director of the division of child protection at Cardinal Glennon.  After an examination of Emmarld, the medical records, and the subsequent autopsy report, he determined that the injury that caused her death was severe child abuse consistent with shaken baby syndrome with impact.  He testified that she would have been incapacitated within minutes of her injury.  

In addition, Dr. Monteleone testified to his opinion that the linear mark across Emmarld's neck was consistent with pulling and twisting the neck of a child's clothing and that the marks on her left arm appeared to be a pattern of a healing burn that had been inflicted intentionally.  Finally, the doctor opined that bruising on each side of a child's mouth or on the cheek is consistent with a person grabbing the child by the mouth and squeezing.  This testimony is consistent with the testimony of Roxanne Harvey regarding the
 
bruising she had seen on both sides of Emmarld's cheeks the weekend before Emmarld's death.

Dr. Raj Nanduri, who is board certified in anatomic, clinical, and forensic pathology, conducted the autopsy on Emmarld.  It was her opinion that Emmarld died from a closed head injury caused by vigorous shaking of the head, which is clinically referred to as shaken baby syndrome.  This was consistent with the retinal hemorrhages, which she observed grossly and through a microscopic examination.

The defense did not present any evidence.

ANALYSIS

Speedy Trial Issues

Defendant first argues on appeal that he was denied his constitutional rights to the effective assistance of counsel and to a speedy trial when defense counsel continued his trial for more than 3½ years without defendant's authorization and over defendant's express objection.  Both the United States Constitution and the Illinois Constitution guarantee to anyone accused of a crime the right to a speedy trial.  U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial"); Ill. Const. 1970, art. I, §8 ("[i]n criminal prosecutions, the accused shall have the right *** to have a speedy public trial by an impartial jury").  The sixth amendment right to a speedy trial is fundamental and, like other sixth amendment rights, is made applicable to the states by the due process clause of the fourteenth amendment.  See 
Klopfer v. North Carolina
, 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988 (1967).  An analysis of a defendant's claim regarding a speedy trial violation is conducted under the four-part balancing test set forth by the United States Supreme Court in 
Barker v. Wingo
, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), in which the conduct of both the prosecution and the accused are considered and weighed.  In particular, we examine (1) the length of the pretrial delay and whether that delay was uncommonly long, (2) the reasons for the delay and to which party the delay is more attributable, (3) whether the defendant asserted his right to a speedy trial in due course, and (4) the prejudice, if any, suffered by the defendant as a result of the delay.  
Barker
, 407 U.S. at 530, 33 L. Ed. 2d at 116-17, 92 S. Ct. at 2192.  Not one of the foregoing elements is dispositive.  Instead, each factor must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record.  
People v. Rievia
, 307 Ill. App. 3d 846, 853, 719 N.E.2d 1077, 1082 (1999).  The ultimate determination of whether a defendant's constitutional speedy trial right has been violated is subject to 
de novo
 review.  
People v. Crane
, 195 Ill. 2d 42, 52, 743 N.E.2d 555, 562 (2001).   At issue here is a 3½ year period from October 31, 1997, the date the State filed an information charging defendant with first-degree murder, to April 2, 2001, the start of the trial.  From the record, it is noted that defense counsel requested multiple continuances over the 3½ year period.  The circuit court approved a minimum of 28 separate orders of continuance.  Generally, courts recognize that a delay of one year is "presumptively prejudicial."  
Crane
, 195 Ill. 2d at 52-53, 743 N.E.2d at 562; see 
People v. Williams
, 299 Ill. App. 3d 143, 148, 700 N.E.2d 753, 756 (1998); 
People v. Lock
, 266 Ill. App. 3d 185, 191, 640 N.E.2d 334, 338 (1994).  This does not mean that defendant was in fact prejudiced, however.  Rather, a "presumptively prejudicial" time period will only trigger the 
Barker
 enquiry.  
Crane
, 195 Ill. 2d at 53, 743 N.E.2d at 562-63.  Finding that the delay of more than 3½ years before the commencement of the trial was presumptively prejudicial to defendant, we therefore will assess the remaining factors of 
Barker
 to determine whether defendant was denied his constitutional right to a speedy trial.

Turning to the second prong, we note that the burden to provide a justifiable reason for the delay rests with the State, and the defendant need only show that the delay was not attributable to his actions.  
People v. Prince
, 242 Ill. App. 3d 1003, 1009, 611 N.E.2d 105, 109 (1993); 
People v. Belcher
, 186 Ill. App. 3d 202, 542 N.E.2d 419 (1989).  Unlike other cases where some of the delays are attributable to the State, defense counsel here requested every continuance from the first one on December 8, 1997, to the last one on March 12, 2001.  We can find no basis in the record for why so many continuances were requested.  We note, however, as did the Court in 
Barker
:

"Delay is not an uncommon defense tactic.  As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade.  If the witnesses support the prosecution, its case will be weakened, sometimes seriously so.  And it is the prosecution which carries the burden of proof.  Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not 
per se
 prejudice the accused's ability to defend himself."  
Barker
, 407 U.S. at 521, 33 L. Ed. 2d 101, 92 S. Ct. at 2187.

Defense counsel was able to extract from the State a plea negotiation that in hindsight was quite favorable to the defendant.  On the morning of the trial, defense counsel explained the State's offer as follows to the court in defendant's presence:

"MR. HAWKINS [defense counsel]: Yes, Your Honor.  At this time we would make a record in this case that the State has made an offer in this case of a plea to the charge of second degree[-]murder, ten years in the Department of Corrections, to reduce the charge from that, with credit for time served.

That the defendant has been advised by *** myself, Mr. Rekowski[,] and Mr. Simmons[] that the likelihood of success in this case is not very good, and he should take the offer.  And it is his desire at this time to reject the offer and proceed to trial.  And I would just like to put that on the record."

Why the State chose to make the offer is unknown.  It may well have been that the State believed that the delay in bringing defendant to trial negatively affected its chances of a successful prosecution.

Additionally, a defendant is bound by his attorney's actions.  In 
People v. Bowman
, 138 Ill. 2d 131, 561 N.E.2d 633 (1990), the court stated:

"The general rule in Illinois is that a client is bound by the acts or omissions of his lawyer-agent.  While not an ironclad rule, it is necessary in order for a representative system of litigation to function.  [Citation.]  In criminal proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics.  [Citations.]  Thus, the affirmative acts of a defendant's counsel cannot be separated from the defendant's own acts."  
Bowman
, 138 Ill. 2d at 141, 561 N.E.2d at 638.  

See 
People v. Hall
, 194 Ill. 2d 305, 328, 743 N.E.2d 521, 535 (2000).

The record clearly establishes that defense counsel caused all the pretrial delay, and therefore, the delay must be attributed to defendant.  Consequently, defendant failed to meet this prong of 
Barker.

Next, defendant clearly asserted his right to a speedy trial.  As evidenced by the record, defendant, through counsel, first made a speedy trial request on November 5, 1997.  Then, on March 18, 1998, defendant sent a letter to the court requesting the court to drop the charges, arguing that he had not authorized defense counsel to continue his case and that any continuances obtained by defense counsel were obtained without his permission.  Almost 2½ years later, on July 12, 2000, defendant sent the court a 
pro se 
motion to dismiss.  The motion argued that his attorney was ineffective and that his case should be dismissed for several reasons, including the fact that defense counsel had continued the case without defendant's consent, thereby violating his right to a speedy trial.

Finally, defendant cannot meet the last prong of 
Barker
–that prejudice resulted.  In assessing prejudice to the accused, the court must consider the interests sought to be protected by the speedy trial right: (1) the prevention of oppressive pretrial incarceration, (2) the minimization of the anxiety and concern of the accused, and (3) the limitation of the possibility that the defense will be impaired.  
Barker
, 407 U.S. at 533, 33 L. Ed. 2d 101, 92 S. Ct. at 2193.  Out of these three interests, the Court in 
Barker
 noted that the third one is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  
Barker
, 407 U.S. at 532, 33 L. Ed. 2d 101, 92 S. Ct. at 2193.

Although it can be argued that defendant spent a lengthy amount of time in prison, resulting in unnecessary anxiety and concern, defendant cannot show that this length of time caused his defense to be impaired.  Defendant claims that prejudice is demonstrated by the fact that one of the witnesses he wanted to call, his estranged wife, had died by the time he was finally brought to trial.  We note, based on the record before us, that defense counsel had investigated the possibility of calling the wife and had decided that her testimony would not have been useful even if she had been an available witness and instead could have served to hurt defendant's case.  This point is further evidenced by defense counsel's filing of a motion 
in limine
 to exclude evidence that defendant had been investigated for abusing his wife's children.  Based on this filing, defense counsel's statements, and the fact that he was living with another woman when the murder occurred, we conclude that defendant was not prejudiced by being unable to call his estranged wife as a witness.

Defendant also attempts to argue that because counsel failed to subpoena medical and telephone records, this evidence may have been lost or destroyed by the time of the trial.  Defendant offers no explanation of how this would have helped his defense and is therefore unable to make the showing of prejudice required by this prong of 
Barker
.

After an examination of the record and after a consideration of each factor identified in 
Barker
, we find that defendant was not denied his constitutional right to a speedy trial.  By this finding we do not wish to promote the type of delay that occurred in this case, but we do not believe, under the circumstances of this case, that the delay reaches the level of a constitutional violation which would result in the "severe remedy of dismissal of the indictment when the right has been deprived."  
Barker
, 407 U.S. at 522, 33 L. Ed. 2d 101, 92 S. Ct. at 2188. 

The detailed chronology of the continuances in this case contained in the dissent does not change the fact that the presentation of the defense was not prejudiced by the delay caused by the defense.  Neither the majority nor the dissent can base its decision on only one of the 
Barker
 factors.  This is not to say that more emphasis cannot be placed on one factor over the other based on the circumstances of the case and the remedy available to the trial court.  The remedy in this case cannot be the suppression of evidence or the granting of a new trial.  Rather, it can only be the dismissal of the murder charge, which is not required in this case.  See 
Barker
, 407 U.S. at 522, 33 L. Ed. 2d at 102, 92 S. Ct. at 2188. 

Defendant also asserts he was denied the effective assistance of trial counsel based on defense counsel's multitude of requests for continuances.  To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  Under the first prong of this test, the defendant must demonstrate that his counsel's performance was deficient.  In other words, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  However, even if it is established that counsel's performance was professionally unreasonable, this, by itself, is insufficient to warrant a reversal.  The defendant must also meet the second prong of the 
Strickland
 test–that counsel's deficiencies resulted in prejudice.  The Supreme Court explained what a defendant must show in order to establish prejudice: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  A defendant must satisfy both prongs of the 
Strickland
 test in order to succeed on a claim of ineffective assistance of counsel.  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct. at 2069, 
People v. Harris
, No. 88468, slip op. at 6 (Ill. December 19, 2002).  We previously found that the delay occasioned by defense counsel did not sufficiently prejudice defendant to deny him his right to a constitutional speedy trial.  Likewise, we find that the delay in bringing defendant to trial did not affect or undermine the confidence in the eventual outcome of the case.  As a result, we also find that defendant was not denied the effective assistance of counsel stemming from the delay of the trial.

Right to Be Present at Trial

Defendant next argues on appeal that he was denied his right to a fair trial when the judge removed him from the courtroom.  Defendant believes that the judge should have admonished him first that he would be removed if he did not behave and that the judge should also have offered him the opportunity to return to the courtroom if his behavior improved.  The right to be present is not an express right under the United States Constitution, but rather, it is implied, arising from the due process clause of the fourteenth amendment.  U.S. Const., amend. XIV, §1.  Article I, section 8, of the Illinois Constitution grants criminal defendants the express right "to appear and defend in person and by counsel."  Ill. Const. 1970, art. I, §8.  Accordingly, both the federal constitution and our state constitution afford criminal defendants the general right to be present not only at the trial but at all critical stages of the proceedings.  
Illinois v. Allen
, 397 U.S. 337, 338, 25 L. Ed. 2d 353, 356, 90 S. Ct. 1057, 1058 (1970); 
People v. Bull
, 185 Ill. 2d 179, 201, 705 N.E.2d 824, 835 (1998).  A
 defendant's due process right of presence under the fourteenth amendment is violated, however, only in the limited circumstance when his absence results in the denial of a fair and just trial.  
People v.
 
Bean
, 137 Ill. 2d 65, 83, 560 N.E.2d 258, 266 (1990); see also 
People v. Lofton
, 194 Ill. 2d 40, 67, 740 N.E.2d 782, 797 (2000); 
Bull
, 185 Ill. 2d at 201, 705 N.E.2d at 835.  "The question is not whether 'but for' the outcome of the proceeding the defendant would have avoided conviction but whether the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges."  
Lofton
, 194 Ill. 2d at 67, 740 N.E.2d at 797-98.  The standard of review to determine whether a defendant's constitutional right to be present at the trial has been denied is 
de novo
.  
People v. Leeper
, 317 Ill. App. 3d 475, 480, 740 N.E.2d 32, 37 (2000).

In this case, the record reflects that as the jury was returning to the courtroom for closing arguments, defendant leaned over the railing and spit water, hitting some of the jurors and spectators in the gallery.  Defendant was restrained immediately by authorities in the courtroom.  Only three jurors were present during this incident, and they were immediately escorted out of the courtroom.  Although the trial judge was not in the courtroom at the time, information regarding the disturbance was transmitted to the judge by the State's Attorney in defense counsel's presence without objection.  The trial court responded by stating:

"Mr. O'Quinn, it is apparent that you cannot behave yourself any more in this courtroom.  It is the Court [
sic
] order that you go back[–]that you be transported back to the Madison County Jail.  You will not be here for closing arguments of counsel because of the fact that you attacked some jurors coming into the courtroom.  The Court is going to have to question those jurors, but you will not be present during closing argument.  Take him back."

Defendant was not denied a fair and just trial.  He was present during 
voir dire 
and at all times during the presentation of evidence.  He was not removed from the courtroom until just prior to closing arguments.  Additionally, the record reflects that defense counsel adequately represented defendant's interests during closing arguments.  Defendant has presented no evidence showing that he was denied his right to be present during the trial resulting in an unfair trial.

Special Interrogatory

Defendant next argues that the use of a special interrogatory to determine the victim's age deprived him of due process and violated the doctrines of separation of powers and
 ex post facto
 application of laws.  The dissent contends that there was no valid legislative authority to impose an extended-term sentence at the time defendant committed the acts which composed his criminal behavior and that the legislation passed to address the 
Apprendi
 issue (
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)) could not be retroactively applied without violating the constitution.

The elements of first-degree murder do not include age as a factor.  720 ILCS 5/9-1(a)(1) (West 1996).  Age, however, was and is a factor in aggravation to be determined by the court at sentencing as a reason to impose an extended-term sentence.  730 ILCS 5/5-5-3.2(b)(4)(i) (West 1996).  At the trial, the jury heard testimony numerous times that Emmarld was 13 months old at the time of her death.  In order to comply with the requirement of finding the aggravating factor of Emmarld being under 12 years of age beyond a reasonable doubt, the State tendered a special interrogatory.  Specifically, it stated, in part: "If you have found the defendant guilty of first-degree murder[,] do you also find that the victim, Emmarld Jade Jackson Bradley[,] was under the age of twelve at the time he committed the offense?"  Each juror answered this question in the affirmative.  Based on this finding, the court sentenced defendant to an extended term of 70 years' imprisonment.  

This court must first determine whether section 5-5-3.2(b)(4)(i) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(4)(i) (West 1996)), as it existed on the date of the crime, was unconstitutional, based on 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because the statute fails to require proof of the victim's age beyond a reasonable doubt.  The answer is that the statute was not and is not unconstitutional if the finder of fact, in this case the jury, is required to determine the aggravating factor beyond a reasonable doubt.  This conclusion is based on 
People v. Thurow
, No. 90911, slip op. at 10-11 (Ill. February 6, 2003).  

The defendant in 
Thurow
 was charged, under sections 9-3(a) and (f) of the Criminal Code of 1961 (720 ILCS 5/9-3(a), (f) (West 1998)), with involuntary manslaughter of a family or household member.  Thurow was found guilty after the jury was instructed on the elements of involuntary manslaughter.  The sentencing judge determined that Thurow was eligible for an enhanced sentence because the victim was a member of Thurow's household (720 ILCS 5/9-3(f) (West 1998)).  Alternatively, the sentencing judge determined that Thurow was eligible for an extended-term sentence based upon the young age of the victim (730 ILCS 5/5-5-3.2(b)(4)(i) (West 1998)).  As a result, the trial court sentenced Thurow to 8 years in prison, a sentence within both the 3-to-14-year range for an enhanced sentence (720 ILCS 5/9-3(f) (West 1998)) and the 5-to-10-year range for an extended-term sentence (730 ILCS 5/5-8-2(a)(5) (West 1998)).  The appellate court vacated the sentence, on the basis that it violated 
Apprendi
, and remanded for a new sentence not to exceed the five-year statutory maximum for the Class 3 felony of simple involuntary manslaughter.  The Illinois Supreme Court affirmed the appellate court's judgment that Thurow's enhanced sentence was imposed in error, reversed the appellate court's order vacating the sentence and remanding for a new sentencing hearing, and affirmed the eight-year sentence imposed by the trial court.

As a part of its analysis in 
Thurow
, the court found that section 9-3(f) was constitutional and was not void 
ab initio
.  The court stated:

"There is no indication here as to the evidentiary standard that is to be applied in making the household-member determination.  Under section 9-3(f), this finding could be made by a preponderance of the evidence.  However, it also could be made based upon proof beyond a reasonable doubt.  Under 
Apprendi
, a finding, based upon a preponderance of the evidence, that the victim was a member of defendant's household could not form the basis for an enhanced sentence.  As noted, such a procedure would be unconstitutional.  However, there is no violation if this determination is made beyond a reasonable doubt.  Because this latter, constitutionally correct procedure is allowed by section 9-3(f), it cannot be said that there is no set of circumstances under which the statute would be valid.  See 
In re C.E.
, 161 Ill. 2d [200,] 210-11 [(1994)].  Section 9-3(f) is not unconstitutional on its face.  Accordingly, we reject defendant's contention that section 9-3(f) is void 
ab initio
."  
Thurow
, slip op. at 12.

Apprendi
 does not require that section 5-5-3.2(b)(4)(i) be considered unconstitutional if the correct standard of proof is applied in determining the aggravating factors.  
Apprendi
 states the following proposition: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[] and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.  That is exactly what occurred in this case.  At the trial, Emmarld's age was "submitted to a jury[] and proved beyond a reasonable doubt" through the use of a special interrogatory. 

We conclude that the court was acting within its express authority when it allowed the use of the special interrogatory and that the interrogatory caused no harm or prejudice to defendant.  See 
People v. Testin
, 260 Ill. App. 3d 224, 235, 632 N.E.2d 645, 652 (1994) ("Although the use of special interrogatories in criminal cases is not favored, they have been used without harm or prejudice to the defendant."); see also 
United States v. Ross
, No. 99 CR 469 (N.D. Ill. March 22, 2002) (memorandum opinion and order) (since the decision in 
Apprendi
, federal district courts have proceeded by submitting special interrogatories to the jury for the determination of drug type and quantity).  In order to comply with the mandate of 
Apprendi
, it was imperative that the State have the jury find the age of the victim beyond a reasonable doubt.  Had the State not done so, upon sentencing, defendant 
may
 not have been eligible for an extended-term sentence.  But see 
Thurow
, slip op. at 12 (an 
Apprendi
 violation is subject to harmless error analysis); 
People v. Crespo
, No. 86556, slip op. at 7-8 (Ill. March 31, 2003) (an 
Apprendi
 violation is subject to plain error analysis).  The State's use of a special interrogatory to determine the age of the victim beyond a reasonable doubt complies with 
Apprendi
, does not violate any of defendant's constitutional rights, and causes no prejudice to defendant. 

Additionally, defendant claims that the court and the prosecutor violated the prohibition against the 
ex post facto
 application of the law "by adding an element of the offense at trial."  Defendant argues because the 
ex post facto
 prohibition prohibits the legislature from retroactively altering the definition of a crime or increasing the punishment for a criminal act, his case should have been governed by the law in effect at the time of the offense.

As a result of 
Apprendi
, the Illinois legislature amended the extended-term sentencing statute.  Pub. Act 91-953, eff. February 23, 2001 (amending 730 ILCS 5/5-8-2(a) (West 1998)); see 
People v. Swift
, 202 Ill. 2d 378, 386 n.1, 387 n.2, 781 N.E.2d 292, 296 n.1, 297 n.2 (2002).  The section now states that where a "trier of fact" finds "beyond a reasonable doubt" the presence of one of the factors in aggravation set forth in section 5-5-3.2(b), the judge may sentence the defendant to an extended term.  730 ILCS 5/5-8-2(a) (West 2000).  This amendment became effective February 23, 2001, almost two months prior to defendant's trial in April 2001. 

Section 111-3 of the Code of Criminal Procedure of 1963, regarding the required form of criminal charges, was also amended at the same time.  Pub. Act 91-953, §5, eff. February 23, 2001 (amending 725 ILCS 5/111-3 (West 1998)).  The section now requires that the State shall provide written notice whenever a fact, other than a prior conviction, which is not an element of the offense will be used to seek an increased range of penalties.  725 ILCS 5/111-3 (West 2000).  The State strictly complied with the written notice requirement by filing a notice to defendant before the trial of the State's intent to seek an extended-term sentence based on Emmarld being under the age of 12.

An
 ex post facto
 law is one that is retrospective, affects substantial rights, and disadvantages the defendant.  
Miller v. Florida
, 482 U.S. 423, 430, 96 L. Ed. 2d 351, 360, 107 S. Ct. 2446, 2451 (1987).  A law is considered 
ex post facto
 if it is both retroactive and more onerous than the law in effect at the time of the offense.  
Weaver v. Graham
, 450 U.S. 24, 30-31, 67 L. Ed. 2d 17, 24, 101 S. Ct. 960, 965 (1981).  A defendant does not, however, have a "vested right" in the modes of procedure used at his trial.  
Miller
, 482 U.S. at 430, 96 L. Ed. 2d at 360, 107 S. Ct. at 2451; 
Dobbert v. Florida
, 432 U.S. 282, 293, 53 L. Ed. 2d 344, 356, 97 S. Ct. 2290, 2298 (1977); 
People v. Felella
, 131 Ill. 2d 525, 536, 546 N.E.2d 492, 497 (1989).  The
 ex post facto
 clause does not limit the legislature's control of remedies or modes of procedure, so long as they do not affect matters of substance.
  Beazell v. Ohio
, 269 U.S. 167, 70 L. Ed. 216, 46 S. Ct. 68 (1925).

The amended versions of sections 111-3 and 5-8-2(a) merely affect a mode of procedure.  725 ILCS 5/111-3 (West 2000); 730 ILCS 5/5-8-2 (West 2000).  They do not 
make the law more onerous on defendant.  The murder of a child under the age of 12 has never been considered an innocent act.  The amendments clearly did not alter legal rules to make convictions easier, nor did they increase the punishment for a previously committed offense or make any changes to the elements of the offense of murder.  The only change made is that the finder of fact must determine the existence of the relevant aggravating factor beyond a reasonable doubt, thereby increasing the burden required of the State.  The amendments do not violate the
 ex post facto
 provision of either the United States Constitution (U.S. Const., art. I, §10) or the Illinois Constitution (Ill. Const. 1970, art. I, §16).  See 
Felella
, 131 Ill. 2d at 537, 546 N.E.2d at 497.

Defendant alternatively argues that this court should reverse because the legislature did not provide for special interrogatories to be given to the jury during the guilt-innocence phase of the trial, relying specifically on the fact that special interrogatories are not favored in the law.  See 
People v. Ruppel
, 303 Ill. App. 3d 885, 708 N.E.2d 824 (1999); 
Testin
, 260 Ill. App. 3d 224, 632 N.E.2d 645.  Defendant argues that the aggravating factor could have been submitted to a jury in a bifurcated approach wherein the jury would not have been given the special interrogatory until after defendant had been found guilty of the offense of murder.

Although the legislature did not specifically authorize the use of special interrogatories at the guilt phase, the legislature also did not provide for a bifurcated sentencing proceeding similar to death penalty proceedings.  See 720 ILCS 5/9-1(d) (West 2000).  Moreover, the use of a nonpattern instruction is left to the discretion of the court, and Supreme Court Rule 451 specifically gives the trial court the authority to use nonpattern instructions when no pattern instructions exist that correctly state the law.  177 Ill. 2d R. 451.  The decision whether to give a nonpattern instruction rests within the sound discretion of the circuit court and should not be overturned on review absent an abuse of discretion.  
Testin
, 260 Ill. App. 3d at 230, 632 N.E.2d at 649.  We find that the trial court judge did not abuse his discretion in submitting the special interrogatory to the jury.

Finally, on the use of the special interrogatory, defendant argues that the trial court and the prosecutor usurped the function of the legislative branch of the government.  This assertion is based on defendant's contention that the court and the prosecutor made the victim's age an element of the offense of murder.  By submitting the special interrogatory  on the age of the victim, the trial court did not make age an element of the offense of murder.  The court was simply utilizing the most logical method of complying with 
Apprendi
 and also acting in accordance with Public Act 91-953.  

[Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.]

CONCLUSION

For the aforementioned reasons, we affirm the judgment of the circuit court of Madison County. 

Affirmed.

HOPKINS, P.J., concurs.

JUSTICE KUEHN, dissenting:

I respectfully take issue with the majority opinion on two fronts.  

It seems clear to me that the defendant was convicted of a crime, and treated to more severe punishment because of it, even though that crime did not exist, and the punishment could not have been imposed, when he committed the acts that compose his criminal behavior.  When he performed the acts that caused this infant's death, the defendant exposed himself to a 60-year prison term, the maximum punishment that he could receive for his criminal conduct.  Subsequently, our legislature authorized juries to determine whether a murder victim is an infant and, if so, attached greater penalties for the crime of killing that infant.  Unlike my colleagues, I believe that this new crime and the penalties it carries must be reserved for those who commit an infant killing on a date after the crime's statutory conception.  Its retroactive application is constitutionally unsound.  

I also disagree with the conclusion that the defendant was afforded his constitutional right to a speedy trial.  I cannot imagine what set of circumstances would have to exist, if what happened here does not constitute a deprivation of the fundamental constitutional right to swift and expeditious justice.  

The determination of whether pretrial delay offends the constitutional imperative of a speedy trial requires us to identify and weigh such things as the length of the delay, the reason for it, the genuineness of a defendant's desire for a swift process to decision, and any resulting prejudice from a trial's delay.  
Barker v. Wingo
, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 116-17, 92 S. Ct. 2182, 2192 (1972).  My colleagues correctly identify these factors but fail to properly apply them in reaching their decision.  They seem to treat each factor as if the Supreme Court required it to exist before a speedy trial violation could occur.  This view is reflected in the declaration, the "defendant 
cannot meet the last prong
 of 
Barker
–that prejudice resulted."  (Emphasis added.)  Slip op. at 9.  

I disagree with this conclusion.  We are told that prejudice should be assessed in light of the interests which the speedy trial right was designed to protect.  While Justice Powell recognizes an impairment of the defense as the most serious interest, he points out that oppressive pretrial incarceration, in and of itself, establishes prejudice.  He writes:

"We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious.  The time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness.  Most jails offer little or no recreational or rehabilitative programs.  The time spent in jail is simply dead time.  Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.  Imposing those consequences on anyone who has not yet been convicted is serious."  
Barker
, 407 U.S. at 532-33, 33 L. Ed. 2d at 118, 92 S. Ct. at 2193.

Undeniably, the length of pretrial detention imposed here visited this kind of harm upon the defendant.  He rang in the new year four times, confined to a jail cell, before authorities attended to the business of deciding his guilt or innocence.  Even so, the defendant did not have to "meet a prejudice prong" for there to be a constitutional violation.  As Justice Powell made it clear:

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.  But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution."  
Barker
, 407 U.S. at 533, 33 L. Ed. 2d at 118-19, 92 S. Ct. at 2193.  

The majority tells us that each factor identified in 
Barker v. Wingo
 "must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record."  Slip op. at 6.  If so, we should set forth that record in a way that does it justice.  The majority's treatment of what happened is far too kind to the State. 

The defendant was arrested and incarcerated on October 31, 1997.  The public defender's office was immediately appointed to represent him.  Neil Hawkins, an experienced assistant public defender with that office, was assigned as trial counsel.  On November 5, 1997, he filed a speedy trial demand on the defendant's behalf.  By December 1, 1997, the State and defense counsel had exchanged formal discovery in the case.  

Ultimately, the evidence in this case consisted of the testimony of 17 prosecution witnesses.  The actual evidence took less than three full days of trial to present.  Nothing was presented on behalf of the defendant.  The defense amounted to a reasonable doubt challenge, based solely upon the circumstantial nature of the State's proof with regard to who actually committed the abuse that resulted in this infant's death.  Defense counsel framed the question for the jury:

"Obviously, this child was abused.  There is no doubt about that.  ***  The question is, [W]ho committed the acts that caused the death ***[?]"  

It was an easy question for the jury to decide.  Having taken two hours to read the transcript of the trial proceedings from start to finish, I have no doubt that the jury decided it correctly.  It seems abundantly clear that there was little to save this defendant from conviction, something that commends defense counsel's plea-bargaining effort.  I can only imagine the frustration he felt when the defendant scoffed at the fortunate fruit of that labor. 

In considering how much weight to assign the length of the delay as a factor in deciding whether a constitutional violation has occurred, we are told:

"[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke [a constitutional] inquiry is necessarily dependent upon the peculiar circumstances of the case.  To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  
Barker
, 407 U.S. at 530-31, 33 L. Ed. 2d at 117, 92 S. Ct. at 2192.

This case was simple and uncomplicated, with hardly a defense to prepare. 

The case was placed on a trial docket call for December 8, 1997.  On that date, someone other than Neil Hawkins appeared and affixed his signature to an order that continued the case to a future trial docket call in either January or February of 1998.  This tolled the 120-day statutory speedy trial constraint at day 39.  

The apparent practice in Madison County criminal courts is to employ a form order to deal with continuances.  The order of December 8, 1997, is like every order that followed.  For illustrative purposes, each form order used to continue this trial is attached as an exhibit to this dissent.

There is nothing in the record, other than the order, to indicate that a motion for a continuance was made.  There is nothing in the record to indicate either the reason for making the motion or the reason for granting it. 

Immediately after the December 8, 1997, order is an identical order file-dated December 22, 1997, that continues the case until March of 1998.  There is no written motion for a continuance.

Section 114-4(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-4(a) (West 1996)) states: "The defendant or the State may move for a continuance.  If the motion is made more than 30 days after arraignment[,] the court shall require that it be in writing and supported by affidavit."  This provision sets forth a host of specific reasons that a defendant could offer to advance the grant of a continuance and warrant trial's delay. 

Important to the analysis of the delay factor are the reasons for continuances.  As the Supreme Court points out: "Closely related to length of delay is the reason *** to justify the delay.  Here, too, different weights should be assigned to different reasons."  
Barker
, 407 U.S. at 531, 33 L. Ed. 2d at 117, 92 S. Ct. at 2192.

The sole written motion for continuance to be found in this record was filed on April 2, 2001.  The need for delay was stated in it, but the case proceeded to a trial.  Not a single written motion for a continuance accompanied a ruling postponing this case.  Not a single order of continuance states the reason a further continuance would be warranted.  I would expect some reason of record for a 3½-year delay in bringing someone to trial.

  The majority does not question the complete absence of reason.  It simply notes, "We can find no basis in the record for why so many continuances were requested."  Slip op. at 7.  Then, it sidesteps the issue by quoting a passage from 
Barker v. Wingo
 that acknowledges that delay can be a defense tactic.  Perhaps the delay was strategic.  Maybe keeping the defendant locked up without a trial for so long had some method to it.  We have no way of knowing.  Notwithstanding, this accused made it known three years before he was afforded a trial that he wanted a speedy one.  When the defendant asked for a new lawyer who would engage in a trial rather than further delay, it was incumbent upon the State to question the tactic's continued use.  

Since the majority speculates that delay was strategic, I will indulge in some speculation of my own about that possibility.  The State offered the most inviting plea bargain imaginable.  No defense lawyer worth salt would have failed to urge the defendant to accept the State's offer.  Defense counsel made his exhortations in this regard known before the trial began.  Had the defendant heeded his advice, he would already be reunited with family and friends instead of appealing his murder conviction and his 70-year prison term. 

Could it be that 28 abstruse continuances were procured to accrue more jail time so that the defendant would accept the State's offer?  Mindful of the apparent outcome that the trial would produce, could defense counsel have decided that pretrial delay would improve his chances of convincing the defendant to plead guilty?  Only a few more trial postponements would have transformed the State's offer into a key to the defendant's jail cell, promising him an immediate release in return for a guilty plea.  A little more delay would have forced the defendant to weigh the severe risks attendant to a first-degree-murder trial against the option of surrendering his innocence and going home. 

 If such a strategy was employed, it could not justify the State's failure to provide a speedy trial.  Beneficent as it might have been, its design to diminish the trial's worth by having the defendant address the State's desire for punishment, and its desire for a disposition without a trial, through endless pretrial detention, would subvert a fundamental constitutional right.  The fact that defense counsel may have viewed this design as a means to promote the defendant's best interests could not absolve the State of its duty to see that the United States Constitution was followed.  

The State would almost certainly have to be a knowing partner in such a design.  It would have to allow for 28 postponements over 3½ years without good reason or purpose, knowing what defense counsel knew–that further delay improved its chance of disposing of the case without a trial while, at the same time, imposing the punishment that it deemed appropriate.  A constitution that ensures the criminally accused a speedy trial could never abide such an alliance between the State and an accused's lawyer, particularly when that accused notifies the State and complains about his lawyer's unwelcome continuances and their effect upon his speedy trial rights.  

Condoning such a practice would fashion a prosecutorial tool ripe for abuse.  The present-day criminal code arms prosecutors with a wide range of offenses and penalties, many of which are applicable to the same criminal acts.  Multiple charges enhance bonds, increase pretrial detention, and allow considerable room for plea bargaining.  Allowing defense counsel to continue the trial to accrue the necessary punishment to meet a plea bargain recommendation would license the State to dispense with a lot of trials that it would otherwise have to afford.  Provided the State could suborn defense counsel to its purpose with a decent-enough plea bargain, the State could impose all of the deprivation of freedom that it felt someone deserved by confining that individual in the county jail to await an illusory trial.  By the time an accused would be afforded the right to a trial, freedom's call would invite its surrender.  

The defendant made it clear that he did not wish to plead guilty.  He insisted in his innocence, something that he had the right to do.  And he personally asserted his right to an immediate trial in March of 1998, three years prior to the State affording him that right.  No matter how well-meaning a defense lawyer may be, no matter how beneficial a plea bargain may seem, it is not a valid defense option to allow a client to sit in a jail cell for years on end in order to coerce him into pleading guilty.  

The best that the majority can say about the lack of reason behind the 28 continuances is that defense counsel asked for them and that defendants are 
generally
 bound by their lawyers' deeds.  However, the record does not indicate that defense counsel always asked for the continuances.  More importantly, on March 18, 1998, the defendant made it known that he was unhappy with the delay already incurred.  He took a jail pencil in hand and wrote a letter to the court in which he "humbly" petitioned the court to do something about the delay and about his appointed lawyer, who kept continuing the case without his consent and against his will.  The letter is a part of the record.  What is not a part of the record is what anyone did about addressing this complaint.

On April 27, 1998, another continuance order was entered, again without a written motion or a stated reason.  The form order bore no signature from either an assistant State's Attorney or the defendant's lawyer.  It continued the trial to June 15, 1998, on the defendant's motion.  The order was entered just five weeks after the court, and presumably the attorneys, knew that another continuance was not what the defendant wanted.  It was entered in the defendant's absence.  He remained in jail and his speedy trial concerns went unaddressed.

On June 29, 1998, an order was entered continuing the trial until August 10, 1998, on the defendant's motion.  There was no written motion, no stated reason for the delay, and no attesting signatures from either of the attorneys.  Since nothing seems to have happened on June 15, 1998, the defendant's statutory right to a speedy trial rekindled on that date.  The State used up another 14 days of the 120 days allowed to bring the defendant to trial on time.  It had 67 days left, but the time tolled. 

On July 21, 1998, the defendant again wrote to the court, requesting a 
habeas corpus
 form, a subtle reminder of the disdain for further delay that he had expressed earlier.

The only documents filed of record between August 5, 1998, and March 13, 2000, are 15 consecutive form orders of continuance, repeatedly resetting the trial to future trial dates and attributing the resulting delay to the defendant.  Neither the State nor defense counsel filed anything, in anticipation of a trial, prior to any of the 15 trial settings.  

The trial was delayed for 17 months.  The defendant rang in the new millennium from the same cell that had been his home for two previous new years.  There is nothing setting forth the need for delay and nothing that gives a reason for allowing it. 

An August 5, 1998, trial date became an August 31, 1998, setting, which, in turn, was postponed to an October 5, 1998, trial date.  On October 5, 1998, the trial was postponed to November 1998.  When November arrived, 11 days passed before the next form continuance order was executed, continuing the case to November 30, 1998.  The statutory time within which the defendant had to be brought to trial diminished to 56 days. 

The November 30, 1998, trial date was postponed to a  January 4, 1999, setting.  On December 21, 1998, a form order continued the case to February 1, 1999, which was subsequently continued to a February 22, 1999, setting.  On February 22, 1999, the trial was postponed to an April 5, 1999, trial setting.  That setting was continued to June 7, 1999.  The June 7, 1999, setting was postponed to a July 12, 1999, trial date.  There was never any stated need for further delay, and there was never any finding to give a reason for allowing it. 

On July 12, 1999, the same kind of form continuance order was entered, continuing the case for the rest of the summer.  The trial was next set for September 20, 1999.  On September 20, 1999, the trial was again postponed by form order until October 18, 1999.  On October 18, 1999, the case was continued in like fashion to November 15, 1999.  On November 15, 1999, the case was continued and set for a trial on December 6, 1999.  

On December 6, 1999, another form continuance order was entered and continued the case to February 7, 2000.  This order was akin to all of the other orders in that there was no written motion and no stated reason for why it was allowed.  However, this time the order was different.  The judge who entered it finally addressed the defendant's wishes.  The following passage appears upon the continuance order: "No further continuances.  Case to be resolved either by plea or trial."  As a third new year ushered in with the defendant still confined in jail awaiting trial, it finally appeared that he would receive one.  

As this series of continuance orders marks the passage of time, there is absolutely no other activity in the record.  There is nothing to indicate that either the State or the defense seriously prepared for the trial in advance of any approaching trial setting.  Not one court proceeding took place, other than those proceedings necessary to produce another form continuance order.  The defendant sat in jail for another 17 months without known reason. 

 On the day mandated for a trial or a plea, another form order of continuance was entered, postponing the trial until March 13, 2000.  The record is silent on the manner in which the court's previous mandate was dealt with.  No written motion was filed and no reason was given for why the added delay was necessary.  The February 7, 2000, form order, continuing the case to March 13, 2000, was different in one significant way.  Instead of being marked as a motion by the defendant, it stated that the motion was by agreement, and it contained a judicial finding that the delay was attributable to the State.  Since the year 2000 was a leap year, the State's allowable statutory time within which it had to provide a speedy trial diminished by 35 more days, to a total of 21 remaining days.

On March 13, 2000, another form continuance order was entered, continuing the case to April 17, 2000, at the defendant's request.  It was like all the others.  However, on March 21, 2000, a new form of order appeared of record.  It followed 16 consecutive form orders of continuance spanning almost two years.

The March 21, 2000, order was an "Order of Pre-Trial and Trial Setting."  It set the trial for 9 a.m. on April 17, 2000, ordered a pretrial conference at 9:30 a.m. on April 14, 2000, and declared that the case would be either tried or pleaded on April 17, 2000.

The record does not reflect that anything happened on April 14, 2000.  No pleadings in anticipation of an impending trial were filed by either party.  Whether the pretrial conference was held is not known.  There is nothing in the record to indicate that anyone believed that April 17, 2000, was a date on which the trial would commence.  On April 17, 2000, another form order of continuance was entered, delaying the trial to a July 10, 2000, setting.  The trial was later postponed by another form continuance order and was reset for September 5, 2000.  

On July 12, 2000, the defendant sent the court a handwritten motion to dismiss his appointed attorney.  Here is what it said, in pertinent part:

"That due to ineffective assistance of counsel Mr. Neil Hawkins[,] Attorney for the Plaintiff herein[,] should be dismissed from His case for the following reasons:

A. Mr. Hawkins has continued Plaintiff's case without his consent, thereby violating his rights to a fast and speedy trial.

B.  Mr. Hawkins has never discussed trial strategies with Plaintiff[,] nor has he been to see Him since Dec[.] 1997.

C.  Mr. Hawkins never gave Plaintiff copies of his Grand Jury [] Transcrips [
sic
] nor [
sic
] copies of His Motion of Discovery requested in 1997.

D.  Mr. Hawkins has not gotten in contact with Plaintiff's witness's [
sic
]."

 Whether any of the allegations were true or not does not matter.  When this pleading was filed in July of 2000, it reiterated the March 18, 1998, complaint, after which 20 additional continuances had been sought and received by defense counsel.  We might expect some inquiry into the defendant's concerns–some proceeding at which defense counsel at least refuted the claim that he was continuing this case against the defendant's will and doing nothing to prepare the case for trial.  We might expect a record in which he explained why the continuances were necessary to the defense.  Instead, there was nothing.  Neither the court nor the State did anything, despite an extremely peculiar pattern of repeated trial postponements, all of which were promoted by defense counsel in the defendant's absence.  More importantly, we would fully expect some scrutiny of any further request for a continuance made by defense counsel in the defendant's absence. 

The next document of record after the defendant's written request to discharge his lawyer is another form continuance order entered September 5, 2000, continuing the trial to October 2, 2000, with the resulting delay attributable to the defendant.  The State agreed to this continuance.  We have nothing to indicate why the State would agree to another continuance after the defendant reiterated that defense counsel was exceeding his charge.  And nothing explains the identity of John Kelly, whose signature appears on the form order as the attorney acting on the defendant's behalf.  

The September 5, 2000, continuance order is Bate-stamped C 59.  The next document of record, Bate-stamped C 60, is another form continuance order.  It is dated December 11, 2000, and continues the case by agreement to January 22, 2001, the resulting delay being attributable to the defendant.  Neil Hawkins signed the form.  We do not know what happened at the trial setting of October 2, 2000, or even if there was such an event.  We are not told why the State was again willing to agree to the further delay of the case.  We do know that the allowable statutory time within which the State had to bring the defendant to trial clearly ran out between October 2, 2000, and December 11, 2000.  No one ever filed for a discharge based upon this violation of the defendant's statutory right to a speedy trial, and that right lays forfeit by virtue of this failing.  However, in assessing all of the factors involved in the constitutional inquiry, it is hardly insignificant that the State would have entertained a discharge for unacceptable delay had a motion been made.  The defendant saw the year 2001 arrive while confined in a Madison County jail cell.  It was the fourth new year to arrive while he awaited a speedy trial.  

On January 22, 2001, the trial was continued to March 12, 2001, at the defendant's request.  Like all of the orders before it, no reason was given why another delay was necessary.  There was no written motion for a continuance, accompanied by an affidavit, filed to obtain the continuance.  

On March 12, 2001, another form continuance order was filed, continuing the case at the defendant's request and attributing the delay to the defendant.  The case was set for trial on April 2, 2001. 

Although the March 12, 2001, order continuing the trial to April 2, 2001, looked identical to all 27 form orders that preceded it, it was not the same.  Something had changed.  The order did not indicate that the court would tolerate no further continuance or that the case would be resolved by a trial or plea on April 2, 2001.  But one has only to look at the pleadings filed after the March 12, 2001, order to know that the case was finally going to go to trial.

  Between June 29, 1998, and the last continuance order, for more than 2½  years, not one document was filed by either party in this case.  The only documents filed, other than form continuance orders, were the defendant's 
pro se
 motion to dismiss and the one-page order setting April 17, 2000, as the trial date.  No one filed supplemental discovery motions.  No one filed any motion 
in limine
.  No one filed a motion to alter the charging instrument.  No one filed a motion to dismiss.  No one filed anything for more than 2½ years, despite the seeming approach of an impending trial month after month.  The record is completely barren of anything to indicate that either the State or defense counsel truly anticipated an approaching trial on any occasion prior to April 2, 2001.  It clearly appears as if no one took any of the other trial settings seriously.  It appears as if everyone knew that the case was not really going to proceed to a trial at any time between June 29, 1998, and the March 12, 2001, setting. 

I am left to wonder why the State would not have filed the supplemental discovery motion that it filed on March 15, 2001, prior to some earlier setting, if it truly anticipated a trial at that setting.  I can only speculate why the State did not file the additional witness list it filed on March 15, 2001, prior to an earlier impending trial date.  So, too, I wonder why the State waited until March 27, 2001, to file a motion for leave to amend its charging instrument and waited until March 28, 2001, to file an extensive motion 
in limine
 to limit the evidence admissible by the defense.  Somehow, it took no interest in filing such matters before any other approaching trial date.  Yet, it managed to file a flurry of requests prior to the trial setting that actually advanced to a trial.  

The same is true of defense counsel.  He filed nothing prior to any trial setting between June 29, 1998, and the March 12, 2001, docket call.  On March 30, 2001, he filed 11 separate motions 
in limine
 to exclude or limit the admission of evidence in the case, two motions to dismiss, and
 a written motion to continue the case, which tendered as a reason that the defendant was not prepared in light of the State having altered the charge one week prior to the trial date. 

As previously noted, there is a logical explanation for this phenomenon.  However, such explanation, if it indeed exists, cannot excuse the defendant's lengthy pretrial detention, particularly when everyone involved knew of his assertion of the right to a speedy trial.  

In 
Barker v. Wingo
, the pretrial delay was four years.  But the defendant was released on bond after the first 10 months of that delay.  Here, the defendant's 3½ years of pretrial detention makes the trial's delay untenable.  It is something that should not be tolerated under our constitution, at least so long as we profess that it ensures the fundamental right to a speedy trial.  An examination of the trial proceedings compounds the egregiousness of the delay's duration.  The need to delay for the purpose of preparing the defense tendered in this case could not justify one year of the delay.  

When we conduct a search for the reason such a lengthy delay occurred, none exists.  The only time the statutory method for requesting a continuance was followed, and defense counsel tendered a valid reason to postpone the trial, the case proceeded to a trial.  Month after month, year after year, defense counsel continued the case at proceedings the defendant did not attend.  On many occasions the State agreed to the continuances.  But no reason for the trial's postponement was ever tendered or required prior to the entry of continuance orders.  The absence of any valid reason for the trial's delay, coupled with that delay's length and the fact that the defendant was confined throughout, commends the finding of a constitutional deprivation.  

Clearly, this defendant expected the State to afford the constitution's promise of a speedy trial, and he made that expectation clear.  It seems indisputable that a person confined to a county jail cell awaiting a trial would be genuine in his desire to be afforded one. Inexplicably, no one paid any heed to his repeated assertion that his lawyer was assisting the State in an ongoing violation of his desire for a prompt disposition of his case.  No one honored his requests for an attorney who would stop asking for continuances.  No one cared that, after two years of delay, he asked the court to dismiss his lawyer and give him his day in court.  I cannot imagine a more insidious assault on the right to a speedy trial than the one that occurred here. 

Finally, the defendant was severely prejudiced by the delay, and that prejudice was as egregious as the delay's length–the complete absence of reason for the delay and the inexplicable routine postponement of the trial in the face of an incarcerated accused's repeated complaints about his attorney continuing every trial date.  The majority notes, "Although it can be argued that defendant spent a lengthy amount of time in prison, resulting in unnecessary anxiety and concern, defendant cannot show that this length of time caused his defense to be impaired."  Slip op. at 9.  It then analyzes the defendant's attempt to show impairment and concludes, "Defendant offers no explanation of how this would have helped his defense and is therefore unable to make the showing of prejudice required by this prong of 
Barker
." Slip op. at 10.  The majority does not make mention of one of the key interests the sixth amendment right to a speedy trial exists to protect–oppressive pretrial detention.  It is completely silent about the profound and inexplicable pretrial detention, ignoring its visceral harm.  Instead, the majority redefines a lengthy delay's harm solely in terms of whether the recipient of that harm can demonstrate an adverse effect upon his ability to defend against the charge. 

We are told that one year of pretrial confinement is presumptively prejudicial.  
People v. Crane
, 195 Ill. 2d 42, 52-53, 743 N.E.2d 555, 562 (2001).
  
This legal tenet is offered without consideration of how a year's delay would impair the ability to defend against a criminal charge.  This principle raises an interesting question in light of the majority's analysis.  Provided that a defendant could not show any adverse effect to his defense, would my colleagues find that a defendant was "unable to make the showing of prejudice required by this prong of 
Barker
" (slip op. at 10) if an incarcerated defendant had to await trial for a decade?  How much time would an individual have to serve in a county jail awaiting trial before the majority could perceive some harm inflicted from that fact alone?

The Madison County jail is a fine facility, but it is still a county jail.  Inmates are multibunked and have no privacy.  There are no outside grounds in which to recreate or, for that matter, in which to see the sun and breathe fresh air.  There are no windows in the cellblock.  Confinement in the facility necessarily visits day after day of idleness and the boredom attendant to it.  Time passes slowly.  I wonder if any of us could say that we would be unharmed by being confined there tomorrow to await a trial set for November of 2006. 

Even though each of the four factors to consider in a speedy trial examination does not have to be met for a constitutional deprivation to occur, all four factors are present here.  In my view, this record compels the vindication of the accused's right to a speedy trial specifically affirmed in the constitution.  
Barker
, 407 U.S. at 533, 33 L. Ed. 2d at 118-19, 92 S. Ct. at 2193.

The majority opinion observes, "By this finding we do not wish to promote the type of delay that occurred in this case, but we do not believe under the circumstances of this case that the delay reaches the level of a constitutional violation ***."  Slip op. at 10.  I would respectfully disagree.  If what happened here fails to reach a level of constitutional infirmity, if an individual can be held without a trial for so long without any reason, despite repeated protestation, the constitutional promise is not worth the paper upon which it is written.  

For these reasons, I respectfully dissent. 

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 05/19/03.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.