2022 IL App (1st) 190882

No. 1-19-0882

Opinion filed March 31, 2022.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 6742 |
| | ) | |
| ARCADIO DAVILA, | ) | The Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Arcadio Davila was found guilty of first degree murder

and attempted first degree murder, then sentenced to a total term of 80 years in prison. On

appeal, he contends the State failed to prove him guilty beyond a reasonable doubt because his

conviction rested on a single eyewitness-victim who misidentified him. Defendant also contends

the State improperly introduced video evidence of his interrogation that was more prejudicial

than probative. Finally, defendant contends the State violated his constitutional right to a speedy

trial. He requests that we reverse his conviction outright or alternatively remand for a new trial. For the reasons to follow, we reverse and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3      Defendant was arrested after he allegedly drove up beside a car in which Ricky Pike and Christopher Dear were sitting and then shot Pike, killing him, and attempted to murder Dear. Dear was the only eyewitness-victim to identify defendant and testify at trial. The State theorized that the shooting was gang related (although neither Dear nor Pike had any gang affiliation) because Dear was unwittingly wearing a baseball cap with rival gang colors in Imperial Gangster territory, thereby spurring the shooting. Defendant meanwhile claimed it was a case of mistaken identity, and he proffered an alibi that he was at home in bed when the shooting took place. He also offered evidence from cell phone towers suggesting he was at home before the murder and court documents suggesting that he was in the Chicago Loop paying off traffic tickets several hours after the murder.

¶ 4      Prior to trial, defendant filed several motions to dismiss the State's case as violating his constitutional right to a speedy trial. The trial court denied the motions, finding that defendant participated in or acquiesced to the delay. In addition, defendant filed an oral motion to exclude certain portions of his videotaped interrogation, claiming the clips were more prejudicial than probative. Following a review of the videotape, the court granted defendant's motion in part and rejected it in part, permitting the State to present some allegedly prejudicial statements. These specific statements will be discussed in further depth in the analysis section.

¶ 5      At trial, the surviving victim, Dear, age 30, testified that he had known defendant since childhood, having lived a block apart and attended grammar school with both defendant and defendant's older brother, Jose, who was in the same year as Dear. Dear had been to defendant's

house and knew his mother, who worked at the laundromat and sometimes gave Dear free wash services. Defendant, his brother, and Dear all played basketball in the alleyways by their respective houses "more times than [Dear] could count." They attended the Boys and Girls Club and generally socialized together. Following grammar school, defendant and Dear went to different schools but still saw each other in the neighborhood and had the same friends. Over the years, defendant and Dear saw each other "thousands" of times. On cross-examination, Dear acknowledged he knew Jose and defendant were members of the Imperial Gangsters during their high school years. In 2004 or 2005, around age 17, Dear moved from the neighborhood and did not see defendant or his brother again until December 2011, when they attended a party thrown by a grammar school friend from the old neighborhood. There, Dear caught up with Jose and also said hello to defendant.

¶ 6    Dear testified that he and defendant nonetheless tragically crossed paths months later after Dear and Pike had spent an evening out in Chicago. On August 2, 2012, Dear and Pike went bar hopping in Wicker Park, although Dear claimed to have had only two drinks and then some food during their outing. Around 3:30 a.m. on August 3, the two drove to Pike's apartment towards Kedzie and Armitage Avenues. Two women they had met while out followed directly behind them in another vehicle. Pike had just moved into the apartment and neighborhood, which was around where Dear had spent his childhood. As Pike drove them, Dear, who was wearing a green and gold Oakland Athletics ballcap in a forward-facing fashion, discussed how much the neighborhood had changed and also observed what still remained.

¶ 7    Around 4:30 a.m., Pike parked along the right side of 2145 N. St. Louis Avenue in a brightly lit stretch, with both the street and alley lights illuminating the area, in addition to the headlights of the women's vehicle behind them. Dear and Pike remained in their vehicle with the

driver-side window down. Dear then saw headlights approach close from behind, and a car pulled parallel to and slightly ahead of them and stopped. Dear, who was not wearing a seatbelt, leaned forward and looked past the driver's side. From there, Dear recognized defendant "instantly" as the lone driver of the parallel vehicle before defendant said in an aggressive tone, "Hey, what's up," as he extended his right arm and fired across the passenger seat into Pike and Dear's car. Dear said, "[i]t was clear enough for me to see him," and Dear was able to observe defendant's eyes. At the time of the shooting, Dear could also see defendant's hair (and even how it was styled in braids), skin complexion, chubby young face, and mouth, even as defendant spoke. Dear wanted to shout, "it's me" and "stop," but there was no time. Instead, he saw about two muzzle flashes and ducked as low as possible, then placed his hands over his head. Pike, who had been buckled in, slouched on top of Dear, and defendant fired about eight more shots before peeling away in his car.

¶ 8 One bullet struck Dear in the left hand, and Pike also was struck and gasping for air with a "glazed look over his face" and blood spreading over his shirt. Despite Dear's pleas for help, the women in the vehicle behind them drove away. Dear exited the car and grabbed Pike, holding his body and encouraging him to breathe, but Pike soon stopped breathing and was dead. Dear could think of no reason why defendant would shoot them. Subsequently, Dear called 911 and was transported to the hospital for treatment of his hand. There, he also met with police.

¶ 9 Initially, Dear told police the shooter's name was "Juney," a nickname for defendant's brother, Jose, but after viewing an image of Jose, Dear clarified that the shooter was defendant, Jose's little brother. Dear testified that while still hospitalized some four hours after the shooting, at 8:20 a.m. on August 3, he identified defendant from a multisubject photographic array. The next day, at 3:20 a.m. on August 4, Dear identified defendant from a live lineup at the police

station and had no doubts or hesitation about either identification. At trial, Dear noted that the station lineup photos showed defendant's hair in a long ponytail, as if the braids had just been taken out, thus buttressing Dear's account that defendant wore braids at the time of the shooting. Dear then testified he was 100% sure defendant was the shooter and also made an in-court identification of defendant.

¶ 10   Chicago police lieutenant James Labbe testified that he met with Dear at the hospital about an hour or two after the shooting. Dear said he knew the shooter to be the younger brother of Jose "Delvia" or "Davila" and described the shooter as a chubby, light-skinned Hispanic man with a baby face, no facial hair, and long hair in braids. Dear believed defendant's nickname was "Juney," although that was later determined to be Jose's nickname, and knew defendant to be a member of the Imperial Gangsters. Dear also relayed that he had gone to grammar school with defendant, a fact Lieutenant Labbe later confirmed by retrieving records from Darwin Elementary School. Officers then presented Dear with a six-person photographic array based on this information, and according to police, Dear immediately and without hesitation identified defendant as the shooter. That day, Dear showed Lieutenant Labbe a Facebook invitation to the December 2011 party, where he had seen defendant, and also showed him defendant's Facebook profile.

¶ 11   An investigative alert subsequently issued for defendant, but on the night of August 3, defendant voluntarily turned himself in. He was questioned by Lieutenant Labbe and another detective from August 3 to August 4, 2012, and presented them with information about his whereabouts and his cell phone. Police then spoke with defendant's mother, stepfather-to-be, brother, and girlfriend/fiancé. On cross-examination, it was noted that police subpoenaed defendant's phone for its cell tower locations and also extracted data, including text messages,

call logs, incoming and outgoing calls, and photos and deleted files. According to a report, police determined a search of the data offered nothing of evidentiary value in the case, meaning police found no incriminatory or exculpatory evidence. Defendant was subsequently released from custody but then arrested about eight months later, in March 2013, and formal charges followed.

¶ 12    Evidence at the murder scene showed three bullet holes in the driver's side door, two in the windshield, a bullet fragment on the passenger dashboard, and a fired bullet that lay in the rear driver's side compartment. Dear's Oakland Athletics cap was also recovered from the front driver's console area of the car. Pike's autopsy report showed he died from six gunshot wounds in his upper left arm, upper left shoulder, upper left chest, left back, left arm, and a superficial wound on his left thigh. The medical examiner ruled it a homicide. In addition, based on a pod video of the area near the shooting, police believed the shooter possibly had been driving a silver or gray car.

¶ 13    The State presented evidence that this otherwise senseless murder and shooting was gang related. Chicago police officer Ronnie Rodriguez, an expert in street gang investigations, testified that in August 2012 the street block where the shooting occurred was specifically controlled by Imperial Gangsters. The Orchestra Albany gang, a rival, was also active in the area, and its members claimed the Oakland Athletics logo as their symbol. He testified an Oakland Athletics hat could be worn cocked to the right or in a regular fashion, and both would represent an Orchestra Albany gang member. As rivals, the gangs did not get along, and if they recognized a member of another gang, they were "expected to take action." Officer Rodriguez testified that defendant's tattoos (*i.e.*, "Chi-Town Gangster," etc.) showed he was a member of the Imperial Gangsters. The State thus implied that defendant would be willing to shoot a person wearing an Oakland Athletics hat and representing the rival gang. The defense, on the other

hand, implied the shooting was perpetrated by a different gang, and hence not defendant, by establishing on cross-examination that the Latin Kings were the "biggest and longest" rival of the Orchestra Albany gang.

¶ 14    Detective Daniel Gillespie testified next that he and his partner, Detective John Lally, conducted a videotaped interview of defendant following his second arrest on March 4 and 5, 2013, about eight months after the August 3, 2012, shooting. In lieu of direct testimony by Detective Gillespie, the State published this nearly three-hour long videotape (exhibit 87[1]) to the jury. The video opens showing a fish-eye camera view of a windowless police holding cell, where defendant is asleep on a bench only to be awakened by a detective walking in. Defendant is interviewed first by one detective (although the record does not distinguish whether it is Detective Gillespie or Detective Lally) serving as the "good cop" for the first 37 minutes and second by the other detective serving as the "bad cop" for the next 40 minutes. During the next hour and a half or so, both detectives interview defendant. The tone throughout vacillates between conversational and strident by the parties. At several points, detectives provide defendant with *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and defendant basically inquires when he will be released, presuming it will be after 48 hours, as in 2012. While the video clearly shows defendant's physical gestures, the camera angle and quality are insufficient to show any detailed facial expressions. Additionally, pursuant to the pretrial hearing, the video was edited with some statements redacted, resulting in a barely noticeable skip

---

[1]The parties agree that the first two-thirds of the video contain a recording of the interview from March 4, 2013, while the last third contains a recording of the interview from March 5, 2013. This court has reviewed the DVD video titled "VIDEO_TS.IFO," which is 2 hours and 42 minutes in length. The record does not contain a transcript of the video interrogation. As such, any quoted material reflects statements taken directly from the DVD recording. Likewise, exhibit 87 is the redacted version of the video. The parties do not indicate whether the full video absent redactions is contained in the record. Detective Lally stipulated to the exhibits and interview.

forward in the interview at various points. We have reviewed the videotape in full and summarize the interview as follows.[2]

¶ 15     At the start, the interviewing detective informed defendant, then age 24, that he had been rearrested for the murder of Pike. Defendant responded he believed another person named Jarvis was already in prison for the murder. Regardless, defendant stated that his story had not changed since he turned himself in pursuant to his lawyer's advice back in August 2012. Defendant insisted that he had already told police where he went and given them the names of seven or eight people with whom he had been at the relevant time. Defendant stated that on August 2, the night before the murder, he had been driving around in his white Buick LeSabre with his girlfriend and another friend but was home by 11 p.m., along with his mother, brother, and stepfather. He fell asleep by midnight.

¶ 16     Defendant acknowledged there was usually a neighborhood group hanging out on the corner of Medill and St. Louis Avenues (about five blocks from where the murder took place), and that's where he picked up his brother around 10 p.m. or 10:30 p.m., before returning home on August 2. Defendant also volunteered that, after he was released the first time in 2012, he cut his hair off because people were confusing him with others, including his brother, and accusing him of crimes. When the detective asked whether the victims might have mistaken defendant for his brother, defendant stated that he and his brother were both home on August 2 and 3.

¶ 17     Defendant further stated that later in the morning of August 3 (after the shooting had occurred) he went via the Blue Line Chicago "L" to traffic court at the Richard J. Daley Center (Daley Center) in Chicago to pay fines around 10 a.m. or 10:30 a.m. This was after also visiting the Secretary of State on Elston Avenue to reinstate his license (which issued several days later).

---

[2]While we have attempted to summarize the interview chronologically, for the sake of readability, certain portions do not follow the order of the video interview.

Defendant and his boss had gone to the Secretary of State's office around 7 a.m. or 8 a.m. The detectives responded that they had talked to defendant's boss already and that he was not with defendant then. Defendant stated his boss was mistaken, as he was old and smoked too much weed. Defendant emphasized that on August 3, he had to get his license paperwork at the Secretary of State first before going to the Daley Center to pay the tickets. Defendant stated that in fact he had paid bills all during that week, including on August 2. He also queried why he would be doing such things, like paying traffic tickets and $1000 fines, the morning after a murder and asserted the police were wasting their time focusing on him as a suspect. He insisted he would not pay fines but then do something to get arrested. Defendant acknowledged that in the morning on August 3, he knew something had happened in the neighborhood because his phone "blew up" with messages, but he did not respond because he had to get to court. Following court, defendant returned to his home and then went to Foot Locker with his girlfriend in the afternoon.

¶ 18    Some 40 minutes into the interview, the detective informed defendant that the surviving victim grew up with defendant and was his brother Jose's age, but the detective did not then reveal the victim's name or image. Defendant repeatedly denied knowing the victims and asserted they did not know him. Defendant stated that police had not shown him photos of the victims previously. The only way he was familiar with Pike was because he had seen his image on a pole, presumably outside, since after the shooting there were photos of Pike everywhere in the neighborhood and the shooting was the talk of the barbershop. Defendant said he had heard another individual, in addition to Jarvis, was involved in the shooting and that both were Imperial Gangsters. He had heard from the barbershop that the victims were "neutrons," meaning they had no gang affiliation, and that the surviving victim had placed his hands over his head

when shot at and when "his buddy" had died. Following this statement, defendant then made a physical gesture to that effect. At some point after the detective told defendant again that the surviving victim went to grammar school with defendant and used to be friends with him, defendant asserted the detective was saying the victim was an "OA or something," meaning an Orchestra Albany gang member, to which the detective responded he had never said that. Defendant then asserted he used to chill with the Orchestra Albany gang and got along with everyone.

¶ 19    Defendant also repeatedly and stridently denied the shooting with such statements throughout as: "I didn't pull up on anybody. I was at my house sleeping"; "At four in the morning, I was probably on my twelfth or thirteenth sleep"; "I didn't shoot nobody"; "I had nothing to do with this case"; "I don't have no gun; I didn't shoot anyone"; "I don't have hate in my heart for people like that"; "Lord as my witness, I get down on my knees right now, it wasn't me, I wasn't there"; "I wouldn't risk myself for anything this dumb at all. Period." He insisted he was never outside at the time of the murder, the accusations were "nonsense," and it was a "bullshit case," since he was just as clueless as police about why the victim would just "put a case on" him. While defendant was sorry for the victim and his family, defendant was not there but was sleeping. Defendant asserted it did not matter what the victim said and suggested several times that police obtain camera footage from the street by the shooting. Defendant said there had to be some other evidence that would point the detectives in the right direction, as they were getting nowhere with him because he did not commit the crime. The detectives nonetheless noted that the evidence was pointing at defendant. When the detectives noted there were only a few people who knew the absolute truth in this case, defendant responded, "Exactly. And, that's me, God, and my family who was there."

¶ 20    Defendant asserted he was no longer active with the Imperial Gangsters but working a full-time construction job and thinking of his kids. Defendant insisted he was trying to get his life in order. Yet defendant acknowledged that he was on the street corner with two Imperial Gangsters who were shot a mere two nights before Pike's murder. He stated, "They shot two of my guys," and defendant took them to the hospital. Defendant believed it was the Latin Kings' doing and stated he could have gotten shot as well. Defendant also acknowledged that his brother previously was shot twice, his cousin was a "King," and many people from the neighborhood knew him, in addition to the police. Defendant further stated that one of his friends, a neutron, lived on that corner. The detective and defendant discussed how defendant became involved with gangs at a young age and how defendant was getting along with his ex-girlfriend, girlfriend, and children. They also discussed his family and siblings. Defendant stated that, even though his brother was shot two times and nearly died, he did not retaliate. That was not how defendant operated because he did not want to get locked up.

¶ 21    Detectives also pursued another line of inquiry as to defendant's associate "Spooky," an Imperial Gangster who used to drive a gray Pontiac (like that thought to be the murderer's). Defendant stated around the time of the murder he did not then spend time with Spooky and only found out about Spooky's look-alike car after defendant was released from his arrest in 2012. Detectives then asked defendant why he was associating with Spooky when defendant knew about Spooky's car (implying the car was the same as that involved in Pike's murder). Defendant stated that every weekend his son and Spooky's son hung out, got haircuts, and ate together. The detective noted that Spooky was a registered sex offender and questioned why defendant would associate with Spooky if he wanted to stay out of trouble.

¶ 22     At the two-hour mark in the interview on March 5, detectives finally revealed Dear's identity to defendant and showed defendant Dear's image. On seeing his image, defendant immediately said, "Oh, I know him!" and claimed to have nothing against Dear, who was not a gang member. Defendant stated he had not seen Dear since grammar school and did not remember seeing Dear at the recent party, although he admitted attending that same party. Defendant then continuously denied the crime, stating he would never do anything to Dear. While defendant acknowledged that he was nearby at St. Louis and Medill Avenues the night before the murder, he claimed it was only for about 30 minutes and then he was home by 11 p.m. Defendant stated he was just as mystified as the detectives about why Dear would identify him as the shooter, stating "Your guess is just as good as mine." Detectives noted that Dear's memory was very good and he would not simply pull defendant's name out of thin air.

¶ 23     Detectives suggested the shooting of Pike and Dear was retaliation for the shooting at defendant and the Imperial Gangsters several nights before, which defendant denied. In response, defendant repeated that he was working a full-time job, that he had responsibilities, and that he had gone to court the morning after the shooting. Defendant stated, "I didn't do it, I'll tell you right now, I didn't do it, though. I'm sorry, I'm not your guy," and "you got the wrong person." Defendant stated both he and the victims were in predicaments because what was happening to both parties was not right. He noted that he had already been in police custody last time for 48 hours. Detectives urged defendant to confess. Defendant said that, if he had done something, he would confess. With that, the video concluded.

¶ 24     Following the video presentation to the jury and during the cross-examination of Detective Gillespie, it was revealed that the detectives had obtained receipts showing that defendant's traffic tickets were paid Thursday, August 2, the evening prior to the shooting. A

printout from the Cook County circuit clerk further showed several previously issued traffic tickets were disposed of at 10 a.m. on August 3, 2012, in Room CL97 at the Daley Center. This would have been six hours after the murder. Defendant's license, according to the Secretary of State database, was renewed on August 7, but detectives never sought further information to confirm or deny that defendant had been to the Secretary of State's office on the morning of August 3, as defendant claimed. Detective Gillespie stated that the purpose of an interrogation was to "find out the truth" and if possible obtain a confession from the suspect. He denied trying to confuse suspects in order to obtain a confession but acknowledged he never presents full information about the investigation to the interviewee. He also acknowledged that defendant did not own a car matching the one they saw fleeing the murder scene, nor did defendant's friend Spooky. In fact, the police were unable to obtain further information about the car captured by the pod camera. Following the aforementioned evidence, the State rested.

¶ 25    Defendant then presented several witnesses in support of his alibi that he was home with family during the shooting and also presented expert testimony generally challenging the reliability of eyewitness identifications. Defendant did not himself testify.

¶ 26    The first witness was Dr. Geoffrey Loftus, an experimental psychologist and expert in perception and memory. Dr. Loftus testified that pre-event information—or what one already knows about the world at the time an event occurs—can bias a witness's perception or memory of that event. Alternatively, post-event information—or what a witness encounters after the event is over—can supplement the witness's memory of the event to create a more coherent or consistent story as to what happened. As such, Dr. Loftus testified that witnesses were capable of developing strong and seemingly real memories that were unwittingly false in certain respects. Several additional considerations, such as the witness's degree of attention, the duration of the

observation, stress, weapons focus, and lighting conditions, could all affect a witness's ability to draw error-free recollections of an event. For example, as to weapons offenses, many victims focused on the weapon to the exclusion of other aspects of the scene, like the appearance of the person holding the weapon. A witness who identified a shooter as an acquaintance would then no longer need to spend energy or resources on determining who the shooter was, and this dynamic could thus lead to misidentifications. If that same culprit were placed in photos or a lineup, this could solidify the post-event memory. Alternatively, high stress situations lent themselves to post-event information "of dubious accuracy." Dr. Loftus opined that a person's high level of confidence in his memory of an event did not necessarily correlate with the accuracy of the memory.

¶ 27    Nonetheless, in this case, Dr. Loftus could not opine as to whether these factors specifically affected Dear's eyewitness recollection. Although Dr. Loftus had reviewed some of the records and reports from the case, he had not reviewed all of them. He probably did not review any video recorded statements and did not interview any witness in the case. He did not remember whether he had reviewed any photos.

¶ 28    Defendant's alibi witness, Jose Mulero, testified next that he was the fiancé of defendant's mother and lived with the family at 5170 N. Lovejoy Avenue during the relevant time in August 2012. On August 2, defendant and his brother Jose came home around midnight (so, technically August 3). Defendant went to his bedroom, while Jose went to the living room to watch television. Around 2:30 a.m., Mulero awoke to use the bathroom and noticed that defendant was asleep in his own bedroom, which was located right next to Mulero's. Again, at 5 a.m., Mulero awoke. As before, he saw defendant asleep in his own bedroom. Mulero, a light sleeper, testified that the apartment walls were thin, insofar as one could hear people talking and

laughing even with their door closed. During the night, Mulero did not hear anyone leave the apartment, although Mulero could not say definitively where defendant was from 2:30 a.m. to 5 a.m. because Mulero was sleeping then.

¶ 29    Defendant also presented evidence showing that he had made a number of cell phone calls using a cell tower near his home. On August 2, those calls occurred around 11:30 p.m. and 10 minutes to midnight. On August 3, they occurred around 1 a.m. and 6 a.m., and two calls were around 8 a.m. In addition, one call took place around 9:30 a.m. on August 3 using a cell tower near 180 W. Washington Street in Chicago. Two other calls took place around 10:30 a.m. on August 3 using a cell tower near 36 W. Randolph Street. The parties stipulated that the Daley Center, where traffic court is held, is located at 50 W. Washington Street. We take judicial notice that, according to Google maps, 180 West Washington Street is within four blocks of the Daley Center, and 36 W. Randolph Street is within one block. See *People v. Clark*, 406 Ill. App. 3d 622, 632-34 (2010). Finally, the last call was issued by defendant's home around 11:30 a.m. on August 3. This evidence tended to support defendant's video statements as to his whereabouts on the morning of August 3, insofar as it showed he was first at home, next in the Chicago Loop, and then home again. However, it likewise showed that the cell phone had no definitive location from about 1 a.m. to 6 a.m. on August 3, within the timeframe of the shooting. Following this evidence, the defense rested.

¶ 30    During closing arguments, the State emphasized that this was a gang-related shooting resulting from Dear's donning of a cap with Orchestra Albany colors while in Imperial Gangster territory. The State also emphasized that Dear was a strong and credible eyewitness based on his long acquaintance with defendant and on the five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), commonly known as the "*Biggers* factors," which Illinois courts use to assess the

reliability of an identification. See *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 32. The State played portions of the videotaped interview seven times before the jury, mostly during rebuttal, although the record does not identify which specific clips were played. The defense argued that Dear's identification was unreliable and was the only evidence against defendant. The defense noted defendant had an alibi with corroborating evidence and that he consistently denied involvement in the shooting.

¶ 31    Following argument and the commencement of deliberation, the jury sent a note containing three questions as to the interrogation video. First, the jury requested to view the portion of the video wherein defendant held his hands over his head and, second, the portion involving the Imperial Gangster shooting several days before Pike's murder and, third, the portion involving Spooky. The court granted the jury's request. Over an hour later, the jury sent another note asking, if it found Dear's testimony credible, would that be sufficient to find defendant guilty? The court instructed the jury that it had the instructions and had heard the evidence and should continue to deliberate.

¶ 32    Ultimately, the jury found defendant guilty of first degree murder and attempted murder. As to both offenses, the jury determined that defendant personally discharged the firearm involved. At the sentencing hearing, it was noted that defendant had a 2010 felony burglary in his background but no other offenses. Taking into account the 25-year firearm enhancement on each count, the trial court sentenced defendant to 49 years for murder and 31 years for attempted murder, to be served consecutively, for a total term of 80 years' imprisonment. Defendant appealed.

¶ 33                                    ANALYSIS

¶ 34                          *Sufficiency of the Evidence*

¶ 35    Defendant first challenges the sufficiency of the evidence against him, maintaining the State failed to prove him guilty beyond a reasonable doubt of first degree murder and attempted murder. When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, we must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). In that sense, our function is not to retry the defendant or substitute our judgment for that of the trier of fact. *Id.* Rather, the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 36    Defendant now challenges Dear's identification testimony as unreliable and, further, points to his alibi that he was home sleeping at the time of the shooting, which he claims renders the evidence insufficient. Where, as here, identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offense. *People v. White*, 2017 IL App (1st) 142358, ¶ 15. It is well established that a single positive identification by a witness who had ample opportunity for observation is sufficient to support a conviction. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22; *People v. Killingsworth*, 314 Ill. App. 3d 506, 510 (2000).

¶ 37    A trier of fact assesses the reliability of identification testimony in light of all the facts and circumstances based on the *Biggers* factors, including (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the

offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification. *Macklin*, 2019 IL App (1st) 161165, ¶ 22; *Killingsworth*, 314 Ill. App. 3d at 510. The *Biggers* factors continue to be the gold standard for assessing evidence where a defendant's identity is at issue. See *Macklin*, 2019 IL App (1st) 161165, ¶¶ 22-23. Moreover, "[w]hile our supreme court and this court have acknowledged studies and decisions that have called into question the reliability of eyewitness identifications, each case must be judged on its own facts against the touchstone" of the reasonable doubt standard. *People v. Lerma*, 2021 IL App (1st) 181480, ¶ 91.

¶ 38    Here, after carefully reviewing the evidence according to that standard in a light most favorable to the State, we cannot say Dear's confident and competent testimony identifying defendant as the shooter was so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt as to defendant's guilt. In light of that standard, Dear's account of the shooting was consistent and credible. See *id.* ¶ 92. Dear testified that he had known defendant and his brother from grammar school, having visited their childhood house only a block away, visited their mother at her laundromat workplace, and also socialized outside school at clubs and on the basketball court in their neighborhood. In short, they had interacted "thousands" of times over the years. Given our reasonable doubt standard, the persuasiveness of identification testimony continues to be strengthened by the witness's prior acquaintance with the accused. See *id.* ¶ 91; *People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006). Although Dear had not seen defendant from about 2004 on, he had seen and spoken with defendant in 2011, some months prior to the August 3, 2012, shooting.

¶ 39    Then, in the early morning hours on August 3, in a brightly lit area of the street, Dear leaned forward and recognized defendant "instantly" after defendant had pulled alongside and a little ahead in a car. Defendant said in aggressive tone, "Hey, what's up," as he extended his right arm and fired into Pike and Dear's vehicle, killing Pike and injuring Dear. At the time of the shooting, Dear could see defendant's long hair (and even how it was styled in braids), skin complexion, chubby young face, eyes, and mouth as it moved. The physical evidence, which revealed bullet holes in the driver's side door and windshield and Pike's gunshot wounds to his left upper body, supported Dear's account.

¶ 40    Applying the *Biggers* factors, although Dear viewed defendant for only a short period, given the strong lighting conditions and position of the two cars, Dear had a clear and unobstructed opportunity to view defendant. See *People v. Wehrwein*, 190 Ill. App. 3d 35, 39 (1989) (noting that an adequate opportunity to view the offender is the most important factor for the trier of fact to determine). Moreover, as to the second factor, Dear's degree of attention was heightened, where he immediately recognized defendant, a childhood acquaintance, with the gun and was mystified as to why defendant would be shooting at him and his friend Pike. Dear testified that, at the time of the shooting, he wanted to shout, "it's me" and "stop," but it was too late. As to the third factor, several hours after the shooting, Dear provided an accurate physical description of defendant as the shooter to police, noting he was a chubby, light-skinned Hispanic man with a baby face and long hair in braids. This description is consistent with images of defendant in the record. Dear knew defendant was an Imperial Gangster and stated to police that

he had gone to Darwin Elementary School with defendant, both confirmed facts. Dear then immediately identified defendant from a photo array and also in a physical lineup.[3]

¶ 41     Under the fourth and fifth *Biggers* factors, Dear thus displayed a high degree of certainty in identifying defendant only several hours after the shooting.[4] See *Macklin*, 2019 IL App (1st) 161165, ¶ 32 (noting, according to research, the expression of certainty at the time of an initial identification is a relevant indicator of accuracy); *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (reviewing courts have found identifications reliable where nearly three months or more elapsed between the crime and the witness's identification). At trial, Dear testified he was 100% sure defendant was the shooter and also made an in-court identification of defendant. This is hardly the vague, doubtful, or uncertain testimony defendant would have us believe.[5] See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (noting that a conviction will not be reversed merely because the defendant claims a witness to be incredible); see also *Macklin*, 2019 IL App (1st) 161165, ¶¶ 31, 34 (noting that Illinois courts have not rejected a witness's expression of certainty as an appropriate factor in the reliability analysis); *Guerrero*, 2020 IL App (1st) 172156, ¶ 34 (same).

---

[3]While defendant asserts in his sufficiency of the evidence challenge that the lineup was suggestive, he has failed to raise that argument in the proper suppression context on appeal. He has forfeited the argument, and we decline to consider it**.** See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

[4]Defendant also argues that the fifth *Biggers* factor, the length of time between the offense and identification, should not apply in this case since Dear had prior knowledge of defendant at the time of identification. He writes, "[t]he clear rationale underlying the length-of-time factor is that a witness's identification will be more accurate if it is made shortly after the precipitating event. The rationale would only seem to apply where the witness does not know the person being identified." Defendant has not cited any law in support of this argument, and we decline to entertain it further. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

[5]During trial, Lieutenant Labbe testified that, when he interviewed Dear about the shooter, Dear gave "a vague description of a light-skinned male Hispanic, chubby, baby-faced, long hair, and they went to elementary school together," and Dear also told Lieutenant Labbe that he knew the shooter. Defendant now hones in on Lieutenant Labbe's use of the word "vague" as a means of challenging the accuracy of Dear's prior description. Yet, we find Dear's description can hardly be thought of as vague.

¶ 42     Thus, defendant's contention that the identification was unreliable and inaccurate because Dear failed to describe defendant's extensive tattoos and his facial hair, as seen in his lineup photograph, is not persuasive. First, defendant's facial hair in his lineup photos, although visible, forms a very light frame around his mouth. The heavier facial hair appears mostly under his chin and on his jaw bones. Viewing his face directly, it is hard to actually see the facial hair. Considering the evidence in a light most favorable to the State, it was certainly reasonable for Dear to conclude defendant had no facial hair. Regardless, in making an identification, a witness need not distinguish a suspect's individual and separate features, such as tattoos and facial hair. *Macklin*, 2019 IL App (1st) 161165, ¶ 28. "Omissions as to a defendant's facial features or other physical characteristics are not fatal," but merely affect the weight to be given such testimony. *White*, 2017 IL App (1st) 142358, ¶ 21 (rejecting a very similar argument as defendant makes). Contradictory evidence and minor or collateral discrepancies in testimony do not automatically render a witness's testimony incredible, and it is the task of the trier of fact to determine if and when a witness testified truthfully. *Macklin*, 2019 IL App 1st 161165, ¶ 17.

¶ 43     Likewise, while defendant points to his expert Dr. Loftus's testimony generally challenging the validity and reliability of eyewitness identifications, the jury apparently was unswayed by this specific evidence. In other words, the jury reasonably could have found Dear's identification was unaffected by pre- or post-event information, so that he did not prejudge the identity of the shooter or supplement his judgment of the shooter's identity. The jury heard Dr. Loftus's testimony that lighting conditions, stress, and weapons focus could all negatively impact the accuracy of identification. It also heard that a witness's confidence in his memory of an event did not necessarily correlate with the accuracy of the memory. Yet, the jury chose to believe Dear, perhaps because Dr. Loftus could not opine on whether any of the above-stated factors

specifically affected Dear's recollection of defendant as the shooter. In any event, it was the jury's duty to evaluate the expert testimony and weigh its relative worth in context and in comparison to Dear's identification. See *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007). We decline defendant's invitation to reweigh the evidence and any inconsistencies or reassess witness credibility, since that was the jury's responsibility. See *Sutherland*, 223 Ill. 2d at 242.

¶ 44    The jury evidently also was not persuaded by defendant's alibi. Defendant presented evidence from his stepfather-to-be, Mulero, that defendant was home around midnight and in his own bed around 2:30 a.m. and 5 a.m. on August 3, the day of the shooting. Cell phone evidence corroborated that defendant made calls pinging off cell phone towers near his home around midnight and 6 a.m. on August 3. Cell phone evidence and court documents also corroborated his contention that he was in the Chicago Loop the morning of August 3, disposing of traffic tickets. Defendant's alibi nonetheless did not account for his whereabouts at 4:30 a.m. on August 3, when the shooting occurred. Given how close his home was to Pike's apartment, where the shooting occurred, the jury reasonably could have concluded defendant committed the shooting but then was home in bed by 5 a.m. when Mulero saw him.[6] See *In re C.A.H.*, 218 Ill. App. 3d 577, 581 (1991).

¶ 45    Mulero, himself, acknowledged he could not say definitively where defendant was from 2:30 a.m. to 5 a.m. because he was sleeping then. Alternatively, the jury simply could have entirely discredited Mulero's testimony. See *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004) (a trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony).

---

[6]We take judicial notice that Google maps reflects that defendant's home at 5170 N. Lovejoy Avenue in Chicago is about 5.6 miles or a 12-minute drive from 2145 N. St. Louis Avenue in Chicago via Kimball Avenue and I-90. See *Clark*, 406 Ill. App. 3d at 632-34. Police in the interrogation video suggested that the morning of the shooting, defendant could have left his home and returned before anyone would notice.

Reasonable doubt is not created merely because alibi evidence exists, nor is the trier of fact obligated to believe alibi witnesses over those of the State, especially where the alibi witnesses are related to the accused and possess an obvious bias. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 90; *Killingsworth*, 314 Ill. App. 3d at 510. Nor is a trier of fact required to search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt. *Jonathon C.B.*, 2011 IL 107750, ¶ 60. Much of defendant's argument as to his alibi and Dr. Loftus's testimony asks that we review the evidence in a light most favorable to defendant; however, as set forth that is simply not our standard of review.

¶ 46    Moreover, defendant does not dispute that he previously had been an active Imperial Gangster and had the tattoo marks to show it. While in his interrogation video interview defendant claimed to have disengaged from the gang, he also acknowledged that just several days before the shooting of Pike and Dear, he had been outside with a number of Imperial Gangsters during another gang-related shooting and was himself shot at. In addition, the jury could have found that several points in the video—for example, where defendant queried whether the detective was saying the victim was an "OA or something" and where defendant mimicked Dear's having reportedly ducked during the shooting—revealed defendant knew more than he was indicating and supported the State's theory that he was the shooter. The State also presented evidence that the block where the shooting took place was controlled by defendant's gang and that there was a rivalry between the Orchestra Albanys and Imperial Gangsters. Given that Dear was wearing an Oakland Athletics ballcap with the colors of the Orchestra Albany gang in rival territory and that Pike was new to the street, this presented persuasive motive for the otherwise inexplicable shooting by defendant. Again, it was the jury's job to weigh the gang

evidence presented and determine whether motive existed. For all the reasons stated, defendant's claim that the evidence was insufficient therefore fails.

¶ 47                    *Admission of Statements from the Videotaped Interrogation*

¶ 48    Defendant next contends the trial court erred by admitting into evidence certain statements police made during his nearly three-hour-long videotaped interrogation. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will only reverse it if there is an abuse of that discretion, *i.e.*, where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position of the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). Defendant maintains the police comments made during the interrogation video improperly bolstered Dear's identification testimony and the State's case and denigrated defendant's credibility. Defendant argues the comments, some of which he objected to, were irrelevant, more prejudicial than probative, and removed the finding of guilt from the province of the jury. Given that the video was key to the prosecution's case, defendant argues the prejudice flowing from these errors was incalculable.

¶ 49    To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and also raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Where a defendant has made a timely objection, a harmless-error analysis arises, and the State bears the burden of persuasion with respect to prejudice. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). That is, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. *Id.* By contrast, a failure to properly object to a claimed error results in forfeiture, and under a plain-error analysis, the error will only be considered where the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant *or* the error was so serious that it affected the fairness of

the trial and challenged the integrity of the judicial process. *Sebby*, 2017 IL 119445, ¶ 48. Under a plain-error analysis, the defendant, rather than the State, bears the burden of persuasion with respect to prejudice. *Thurow*, 203 Ill. 2d at 363.

¶ 50    Defendant now invokes both the harmless and plain error analyses since he objected to only some of the claimed errors. We first consider those properly objected-to errors as to the videotaped interrogation. We note the State was entitled to introduce the videotaped interrogation during its case-in-chief since any statement made by an accused, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission even if it is not inculpatory or against interest. *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 55.

¶ 51    As a result, generally an investigating officer's questions or statements in a videotaped interrogation are admissible to demonstrate their effect on the defendant, to explain the defendant's response (or lack thereof), and to explain the course of the officers' interview/investigation. *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 54. These statements, including opinions and observations as to a defendant's guilt or credibility, may be presented in the videotaped interrogation even if they are inadmissible as direct testimony. *McCallum*, 2019 IL App (5th) 160279, ¶ 56; *cf. People v. Terrell*, 185 Ill. 2d 467, 496 (1998) (noting that a witness, whether expert or lay, may provide an opinion on the ultimate issue of fact in a case). The officers' questions or statements should be helpful to the jury in understanding the context of the defendant's communications, and practical considerations thus come into play. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48. In certain instances, for example, redacting the officer's remarks would render the defendant's responses nonsensical; in other instances, the police accusations may simply serve as a standard and permissible interrogation tactic. See

*People v. Theis*, 2011 IL App (2d) 091080, ¶ 33; *People v. Moore*, 2012 IL App (1st) 100857,

¶ 52; see also *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 38 (noting that, in an

interrogation, police may use a variety of noncoercive techniques, which include playing on a

suspect's ignorance, fears, and anxieties).

¶ 52    Nevertheless, a police officer's statements during a videotaped interrogation are

ultimately subject to both relevancy requirements and the familiar test of weighing their

probative value versus prejudicial effect. *Hardimon*, 2017 IL App (3d) 120772, ¶ 35. Relevant

evidence has any tendency to make the existence of a fact of consequence to the case more

probable than it would be absent the evidence. *People v. Lewis*, 165 Ill. 2d 305, 329 (1995).

Thus, such evidence should assist the jury in resolving questions of fact. *People v. Owens*, 372

Ill. App. 3d 616, 622 (2007). However, a statement, even if relevant, should be excluded if its

prejudicial effect substantially outweighs its probative value. *Hardimon*, 2017 IL App (3d)

120772, ¶ 35. For example, prejudice arises when a police officer, as a recognized authority

figure, informs the jury that it should believe a portion of the prosecution's case. *People v.

Hanson*, 238 Ill. 2d 74, 103 (2010) (citing *People v. Crump*, 319 Ill. App. 3d 538, 544 (2001))[7];

*Hardimon*, 2017 IL App (3d) 120772, ¶ 35. Likewise, evidence that a witness believes a

defendant is guilty may be unfairly prejudicial. *Hanson*, 238 Ill. 2d at 102-03; see also *People v.

Munoz*, 398 Ill. App. 3d 455, 488-89 (2010) (noting that an officer's testimony at trial that he did

not believe the defendant ever told him the truth was an impermissible comment on the

defendant's credibility). Indeed, a witness is not permitted to comment on the veracity of another

witness's credibility. *Munoz*, 398 Ill. App. 3d at 487.

---

[7]We note that, while our supreme court in *Hanson* relied on this proposition relating to prejudice from the appellate case in *Crump*, the *Hanson* court overruled *Crump* insofar as *Crump* declined to recognize a distinction between present and past opinion. See *People v. Degorski*, 2013 IL App (1st) 100580, ¶¶ 84-85.

¶ 53    Each case involving a videotaped interrogation must be decided on its own facts while viewing the statements of both the police and the defendant in the context of the entire video and against the evidence offered at trial. See, *e.g.*, *McCallum*, 2019 IL App (5th) 160279, ¶¶ 66-76; *Dunbar*, 2018 IL App (3d) 150674, ¶¶ 52-54; *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 34-39; *Moore*, 2012 IL App (1st) 100857, ¶¶ 49-56. With that in mind, we proceed in our review of this unique case.

¶ 54    Defendant contends the following objected-to statements[8] by police about Dear were improperly admitted:

"But what I will tell you is what this guy [(Dear)] is saying. And he's saying he's known you since you guys were little *** were pups. Okay? And, you mentioned last time you were here about ya know that you and your brother look exactly alike ya know and that people mistake the two of you all the time. Well that didn't happen here, because [Dear] knows the two of you."

"His memory's pretty fucking good, and it was dead on *** he's pretty accurate with what he says, and that's why I don't think that he's fucked up here."

"Why would this guy [(Dear)], who's got no gang affiliation, ever, none *** no gangs, ever, ever, in their history, no arrests, ever, in their history *** And dude knows you from this tall *** What makes him just put it on you?"

"He's not going to pull your name out of thin air and just put a case on you for his buddy who just got murdered and he got shot. He ain't gonna do it. It doesn't make any sense."

---

[8]We note there are slight variations in the statements defendant presented in his appellate brief and those in this opinion. We have attempted to transcribe the detectives' videotaped statements as accurately as possible without the aid of a formal transcript.

¶ 55   Defendant argues, and we agree, that these statements were more prejudicial than probative. As defendant notes, the detectives vouched for the reliability of Dear's identification of defendant as the shooter by describing Dear's memory as "pretty fucking good," "dead on," and "accurate." The detective went so far as to state his personal opinion, "that's why I don't think that he's fucked up here," providing an official imprimatur to Dear's testimony and, therefore, defendant's guilt. In addition, the detectives for all intents and purposes asserted there could be no mistake because Dear knew defendant and his brother and had since they were young. In fact, whether defendant knew the victims or grew up with one was discussed some 16 times during the interrogation. The detectives' statements in that regard were the equivalent of prior consistent statements at a trial, which are prohibited because they unfairly enhance a witness's testimony. See *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. Indeed, " '[p]eople tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve.' " *Id.*

¶ 56   In short, the detectives' statements bolstered Dear's trial testimony. The detectives thereby informed the jury that it should believe the prosecution's case over the defense, since the State was required to prove the identity of the shooter beyond a reasonable doubt. See *Hanson*, 238 Ill. 2d at 102-03; *Hardimon*, 2017 IL App (3d) 120772, ¶ 35; *Munoz*, 398 Ill. App. 3d at 489. The statements were highly prejudicial because the jury was likely to credit them with more weight due to their repetitive quality and the detectives' status as authority figures. See *Munoz*, 398 Ill. App. 3d at 489.

¶ 57   Defendant further argues the following objected-to statements by police about the strength of the State's case were improperly admitted:

"If it was a weak case then you wouldn't be back in here; if there wasn't enough to pick you back up, then you wouldn't be back in here. But there is *** This guy [(Dear)] who picked you out *** this guy who you accidentally shot[.]"

"There's people pointing the finger at you *** There's other stuff too, but we won't get into that."

"Do you think that there's only one person that's got their finger on you and it's just the surviving victim?"

"Problem is everybody points in your direction *** even if there is another direction to go *** everybody we talked to."

"Like we said yesterday, all the arrows are pointing in one direction."[9]

"If I told you who tricked on you, and you went out and killed them, I'd be fucked. Do you think I'm gonna risk my career over something like that?"

¶ 58    Defendant argues, and we agree, that these comments also improperly bolstered the State's case, this time by misleading the jury into believing there were additional witnesses against defendant who were either unwilling or unavailable to testify. This was, after all, a gang-related shooting according to the State's theory, so it would be reasonable for the jury to infer certain witnesses were too intimidated to come forward and testify at trial. Ultimately, the statements suggested the State had more corroborative evidence implicating defendant as the shooter, despite the fact that there was only one eyewitness at trial. These remarks were not simply course-of-investigation comments, which would be permissible, but conclusory statements of fact. *Cf. People v. Simms*, 143 Ill. 2d 154, 174 (1991) (noting that trial testimony

---

[9]While the cliché statement "all the arrows are pointing in one direction" could be likened to a common interrogation tactic, here, detectives suggested that there was additional evidence tying defendant to the crime. The statement, when considered with the other statements, was prejudicial.

by a police officer describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant).

¶ 59    Moreover, we note that, pursuant to defendant's oral motion *in limine*, the parties agreed to redact the first and the third statements set forth immediately above (starting respectively with, "If it was a weak case then you wouldn't be back in here" and "Do you think that there's only one person that's got their finger on you"). However, there is no explanation as to why the statements were included in the video and shown to the jury. At the very least, this suggests that the State believed the remarks were more prejudicial than probative and that the trial court did not disagree. As to the first comment, the court specifically found it referenced probable cause to arrest and was an inappropriate matter for the jury. The court's ruling to redact those statements was not an abuse of discretion, notwithstanding that the statements were subsequently presented to the jury.

¶ 60    Likewise, the remarks above reveal that, during the interrogation, detectives specifically urged that it was defendant who shot Pike. The detective suggested defendant would kill the person who "tricked on" him (which we take to mean gave his name to police), although there was no evidence as to that particular person. The quantity and quality of these remarks insinuated that there was more evidence against defendant and the detective himself believed defendant to be a killer and therefore guilty, also bolstering the State's case.

¶ 61    Here again, the detectives basically implied that the State should be believed over defendant, thereby causing prejudice. See *Lewis*, 165 Ill. 2d at 329 (noting that prejudice can be defined as to suggest deciding a matter on an improper basis); see also *Munoz*, 398 Ill. App. 3d at 489 (noting, the detective's testimony that " 'he never believed that the defendant told him the truth' " on the night in question essentially translated to instructing the jury not to believe the

defendant). Credibility is not itself a discrete fact but the lens through which all ultimate facts must pass, and thus it is the decisive thing. The jury, as arbiter, is the reviewer of those ultimate facts in light of who it finds most credible. Where, as here, a police officer repeatedly vouches for and enhances the credibility of the State's single eyewitness and portion of the prosecution's case, such conduct usurps the jury's role in a manner that can be simply devastating. See *Munoz*, 398 Ill. App. 3d at 489. While the trial court found the objected-to statements were relevant and needed for context, were simple interrogation techniques and standard police interview process, and were more probative than prejudicial, we find the court's determination to be unreasonable. We thus reject the State's response that the statements provided necessary context to the exclusion of prejudice.

¶ 62      In that sense, this case can be likened to *Hardimon*, 2017 IL App (3d) 120772, where this court concluded the defendant's trial counsel was constitutionally ineffective for failing to further redact the video recording of the defendant's interview with police. There, from the hour and twenty-minute long video, police spent the last 50 minutes goading the defendant into a confession that, in the early morning hours outside a nightclub, the defendant shot and murdered the victim. Police claimed the evidence was so heavily weighted against the defendant that the prosecution would insist on taking the case to trial, thereby prevailing and presenting the defendant with a lengthy prison term. *Id.* ¶ 36. Police described the defendant as a " 'liar' " and " 'cold-blooded killer' " and relayed that the media would display the word " 'execute' " next to the defendant's photo. *Id.* ¶¶ 34, 36.

¶ 63      Meanwhile, the defendant in *Hardimon* was adamant that, although he was at the nightclub and heard the gunshots, he did not participate in the shooting, and his version of events remained the same even in the face of the detectives' interrogation threats. This court concluded

the unredacted portion of the video was not relevant and more prejudicial than probative, where it "removed the finding of guilt from the province of the jury as the detectives conclusively stated that the defendant was guilty of murder." *Id.* ¶ 37. This court found the video therefore bolstered the State's case and disparaged the defendant.[10] Given that there was no witness who identified defendant as the shooter nor any physical evidence directly connecting the defendant to the offense, the court held that the video resulted in reversible prejudice.

¶ 64    As in *Hardimon*, here, given that defendant never admitted to the shooting but consistently denied it during the videotaped interrogation, the statements did not serve to show any transformation in defendant's story or provide helpful context. The aforementioned interrogation tactics thus had no material value. In that sense, the statements were irrelevant and, regardless, more prejudicial than probative. *Cf. McCallum*, 2019 IL App (5th) 160279, ¶¶ 66-71 (finding that 18-minute redacted videotaped interrogation segment created context for the entire 53-minute redacted videotaped interrogation and also showed the defendant's incongruous emotional response to his friend's dying declaration in a 911 tape identifying the defendant as the shooter; given that, plus the defendant's changing alibi, the challenged portion of the videotape was held relevant and more probative than prejudicial); *Dunbar*, 2018 IL App (3d)

---

[10]In *Hardimon*, the court wrote that "a police officer's opinion statement regarding the ultimate question of fact possesses significant prejudice as the officer is a recognized authority figure." 2017 IL App (3d) 120772, ¶ 35. Yet, in *Terrell*, 185 Ill. 2d at 496, our supreme court held that a witness, including a police officer, may provide an opinion on the ultimate issue in a case. There, the police detective was permitted to testify he had never before seen injuries like those suffered by the victim so as to establish an ultimate issue in the case—the exceptionally brutal or heinous nature of the crime. *Terrell* noted this was so "because the trier of fact is not required to accept the witness' conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." *Id.* at 496-97; see also *Owens*, 372 Ill. App. 3d at 621 (following *Terrell* and noting the ultimate-fact doctrine has been discredited); Ill. R. Evid. 704 (eff. Jan. 1, 2011). *Terrell* preceded *Hardimon*. Therefore, we presume the *Hardimon* court, in its above statement, intended to convey that a police officer is generally prohibited from opining on matters involving credibility, especially as to a defendant's guilt. See *Hanson*, 238 Ill. 2d at 102-03 (noting that evidence that a witness believes a defendant is guilty may be unfairly prejudicial); *Munoz*, 398 Ill. App. 3d at 487 (noting that a witness is not permitted to comment on the veracity of another witness's credibility).

150674, ¶ 54 (noting the investigating officers' statements did not rise to the same level of prejudice as in *Hardimon*). Here again, the identified comments buttressed the State's single eyewitness-victim, while also suggesting extraneous evidence, including some phantom witnesses not presented at trial, strengthened the State's case that defendant was the shooter.

¶ 65 These comments also diminished the relevant and more probative portions of defendant's statements in the video. Those included defendant's alibi; his gang history; the fact that he was present during a gang-related shooting at St. Louis and Medill Avenues a mere two nights before the murder; whether defendant had heard from the neighborhood and barbershop of the victim's identities, especially given that he claimed to know everyone in the neighborhood; defendant's assertion that the detective was saying the victim was an "OA or something" and his subsequent changing of the topic; defendant's physical gesture of ducking as he had heard the victim did; his haircut following his release from the first arrest; and defendant's acknowledgement that he knew the victim.

¶ 66 The State attempts to distinguish *Hardimon*, arguing against reversal and claiming any error was harmless. To determine whether an error is harmless beyond a reasonable doubt, courts examine whether the error contributed to the defendant's conviction and whether the other evidence in the case overwhelmingly supported the defendant's conviction. *People v. Lerma*, 2016 IL 118496, ¶ 33. However, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. *Thurow*, 203 Ill. 2d at 363; *Johnson*, 2012 IL App (1st) 091730, ¶ 65.

¶ 67 The State maintains the evidence in this case was overwhelming where Dear identified defendant, a person he had known since childhood. The State has failed to cite an appropriate case in support of this argument (see Ill. S. Ct. 341(h)(7) (eff. Oct. 1, 2020)), and regardless, we

find it contradicted by our supreme court's recent decision in *Lerma*, 2016 IL 118496, ¶¶ 24, 33. There, a gunman dressed in black approached and shot the victim, who was sitting on his unlit front porch late at night with a friend, Lydia Clark. The victim's dying words were that "Lucky" shot him. Lucky, the defendant, lived across the street and had been friends with the victim several years, often spending time at his home. *Id.* ¶ 5. In addition to that dying declaration, Clark identified the defendant as the shooter from a photo array several hours later and in a show-up the next day, as well as in court. Clark did not specifically know the defendant but had seen him across the street at least once or twice. *Id.* ¶ 6. The supreme court found the evidence in *Lerma* was not overwhelming where, other than Clark's testimony, the only evidence was a dying declaration not subject to cross-examination. The court therefore held the error of excluding relevant and probative expert testimony on identifications contributed to the defendant's conviction and was not harmless. *Id.* ¶ 33.

¶ 68    *Lerma* at least suggests that, while knowing a defendant might constitute sufficient or even substantial evidence to support a conviction, it is not overwhelming. See *id.* As in *Lerma* and *Hardimon*, in this case there was no physical evidence tying defendant to the crime, and he neither confessed nor made an unequivocally incriminating statement. Rather, the evidence of defendant's cell phone usage and location, plus court documents, offered some support to the alibi evidence that he was home sleeping and went to court the next morning to pay traffic fines. In addition, defendant's denials of his guilt in the videotape remained consistent throughout the heavy interrogation.

¶ 69    Thus, here, the prosecution claimed, based on its eyewitness and victim, that defendant committed a gang-related murder when he mistook Pike and Dear for rival members, and defendant claimed it was Dear who mistook him as the shooter. Where the State's case rested

entirely on witness credibility with only minimal circumstantial evidence tying defendant's gang activity to this particular shooting, we cannot say the evidence was overwhelming. See *Johnson*, 2012 IL App (1st) 091730, ¶ 65 (noting that the evidence was not overwhelming where the jury was required to choose between two eyewitnesses identifying the defendant as a drive-by shooter and three alibi witnesses testifying the defendant was in a different state on the day in question; notably, one State eyewitness knew the defendant for about four years before the crime); *cf. McCallum*, 2019 IL App (5th) 160279, ¶¶ 72-76 (finding the result on retrial would not have been any different absent the videotaped interrogation where there was a 911 recording of the victim's dying declaration identifying the defendant as the shooter and an additional eyewitness identification of the defendant, plus circumstantial evidence).

¶ 70    The State also argues the prejudicial impact of the detectives' remarks was diminished by the lengthy videotape and the remarks therefore did not contribute to his conviction. We cannot agree. The video featured prominently at trial and in the State's closing, especially during rebuttal. *Cf. McCallum*, 2019 IL App (5th) 160279, ¶ 76 (noting that the interviews with police were not the central pieces of the State's case). In particular, the State argued Dear was credible and accurate because he knew defendant and had since grammar school, thus following the same line as the interrogation. The jury requested to see the video while deliberating, and the identified errors may well have influenced its decision. See *Johnson*, 2012 IL App (1st) 091730, ¶ 65; *Munoz*, 398 Ill. App. 3d at 489. Consequently, we cannot say beyond a reasonable doubt that the jury verdict would have been the same absent the prejudicial statements. See *Thurow*, 203 Ill. 2d at 363. The State has failed to fulfill its burden of proving the error harmless.

¶ 71    This case can thus be distinguished from *Hanson*, 238 Ill. 2d 74, which addressed whether the live testimony by a police officer was improper opinion, relevant, and more

prejudicial than probative. There, a police officer testified at trial that during his investigation he had confronted the defendant by phone, asserting that the defendant's sister Jennifer (who also testified at trial) thought the defendant " 'did this.' " *Id.* at 88. The "this" was a quadruple murder of his family members. *Id.* at 79. *Hanson* held the officer's statement was not improper opinion testimony, where the officer merely relayed that "Jennifer thought defendant had caused the victims' deaths" but not that he presently "believed defendant was guilty." *Id.* at 101. Jennifer likewise did not testify defendant was guilty. Subsequent cases have interpreted this to mean "present opinion testimony is improper" while "previous opinion testimony is permissible." *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 84 (cases cited therein); *Moore*, 2012 IL App (1st) 100857, ¶ 52.

¶ 72     We find this to be a distinction without much difference before a jury, but even so, here, it is quite possible the jury mistook the video statements for Detective Gillespie's present opinion of defendant's guilt. The video was presented in lieu of any substantive direct testimony, and there was no limiting instruction. On cross-examination, Detective Gillespie noted that the purpose of the interrogation was to "find out the truth," denied deploying tactics to confuse suspects, and stated he never revealed full information to the suspects. *Cf. McCallum*, 2019 IL App (5th) 160279, ¶ 43 (notably, the officer testified at trial that he made false statements to the defendant in the interrogation video and that lying was a common interrogation tactic). Although the State suggested during oral arguments that cross-examination would clarify that the video statements were not the detective's beliefs, we find it did the opposite. Thus on the stand, Detective Gillespie essentially endorsed his past position from the video. Given that the evidence in this case also corresponded with that cited in the video (such as defendant and Dear's grammar school records, defendant's court documents, and defendant's cell phone evidence), a

jury likely could not decipher when the detectives were bluffing. The jury may well have been more likely to take the detectives' statements in the video as present fact.

¶ 73    Apart from that distinction, in *Hanson*, the officer did not repeatedly vouch for the truth of Jennifer's statement that the defendant committed the murders. Here, the officers did vouch for and bolster the only eyewitness's statement identifying defendant. As defendant writes, "here, the jury heard that the *police* deemed the information reported by Dear and other unnamed persons to be credible." Such prejudice was not present in *Hanson*, where the conversation between the officer and the defendant was brief and in context described the officer's reason for suspecting defendant. The supreme court held the officer's statement explained why the investigation focused on defendant and why defendant later fled. We cannot say the same about the videotaped interrogation statements here.

¶ 74    Defendant also challenges a number of statements under the plain error doctrine, reserved for errors that were not properly preserved. Because we reverse for the above-stated reasons, we need not apply that doctrine or defendant's alternative argument as to ineffective assistance of counsel. However, we find the comment, "Well, you shot Ricky," to which no objection was raised, likewise did not aid the jury in its determination and was more prejudicial than probative for the reasons enumerated above. The same applies to the comment, "If it's somebody [(Dear)] that's saying, listen I know this guy, I'm 100% sure that it was him. I grew up with him, I grew up with his brother."

¶ 75    In addition, we find no relevance to the police officer's comments about defendant's associate, "Spooky." As Detective Gillespie explained on cross-examination at trial, while detectives believed the shooter possibly drove a silver or gray car, they determined that it was not Spooky's. Yet extensive comments about Spooky were permitted to air in the video, albeit

without a proper defense objection: "He's a registered sex offender, too, you know that?"; "If you want to stay out of trouble, why the fuck ya hanging out with a registered sex offender?"; "There's gotta be better kids that your son can interact with, right?"; "Why is Spook a registered sex offender *** So you don't know if he did shit to kids or anything like that?"; "Why would you want your son anywhere near him?"; "My point is, it doesn't sound to me like somebody who wants to stay out of trouble, the company that you're keeping."

¶ 76    Given that Spooky had nothing to do with the shooting, the only reason to include this commentary would have been to rebut defendant's contention in the video denying his gang involvement and his claim that he aimed to lead a lawful life. Yet, defendant's acknowledged presence by the gang shooting several nights before the shooting of Pike and Dear was sufficient to rebut this contention. The discussion of Spooky, including his sex offender status, ultimately lacked any connection to the crime at hand, it was confusing, and regardless, it was more prejudicial than probative. Therefore, on remand, such portions of the video should be redacted.

¶ 77    Defendant also complains about several additional comments. The first references Dear's lack of gang affiliation in contrast to defendant and his brother having been shot at, and the second comment notes that the victims were not gang bangers, even though the shooter thought they were. We find those comments are appropriate in context, relevant for the purposes of motive, and responsive to defendant's queries suggesting Dear would have noticed defendant's tattoos if he were really the shooter. They do not constitute commentary on credibility matters involving defendant's guilt or Dear's identification, and therefore they were not prejudicial. Second, the statement that defendant could easily access a gun was reasonable based on defendant's long affiliation with gangs and was not unduly prejudicial.

¶ 78    *Speedy Trial Claim*

¶ 79    Last, defendant contends his constitutional right to a speedy trial was violated, necessitating dismissal of his case. The sixth amendment guarantees that in all criminal prosecutions the accused has the right to a speedy trial. *Doggett v. United States*, 505 U.S. 647, 651 (1992). Cases have qualified the literal sweep of this provision by identifying several factors for determining whether a particular defendant has been deprived of his right, including (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether in due course the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as a result of the delay. *Id.*; see also *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972). All four factors are closely related, and no factor is singularly dispositive. *People v. Crane*, 195 Ill. 2d 42, 52 (2001); *People v. Echols*, 2018 IL App (1st) 153156, ¶ 11.

¶ 80    Accordingly, each factor must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record. *People v. O'Quinn*, 339 Ill. App. 3d 347, 354 (2003). The defendant need only show that the delay was not attributable to his conduct, and the State bears the burden of justifying any delay that has occurred. *Crane*, 195 Ill. 2d at 53; *People v. Belcher*, 186 Ill. App. 3d 202, 206 (1989). Reasons for the delay are accorded different weight. *Crane*, 195 Ill. 2d at 53. Evidence that the State intentionally delayed prosecution to gain some tactical advantage will weigh heavily against the State, while neutral reasons, such as a crowded court docket, faulty police procedure, negligence, or incompetence, will weigh less heavily. *Id.* When resolving a constitutional speedy-trial claim, any factual determinations made by the trial court will be upheld on review unless they are against the manifest weight of the evidence. *Id.* at 51. However, we review *de novo* the ultimate

determination of whether a defendant's constitutional speedy-trial right has been violated. *Id.* at 52.

¶ 81    As set forth, when assessing a constitutional speedy-trial claim, the first consideration is the length of the delay. Defendant now complains he awaited trial over five years, where he was arrested in March 2013 and not tried until July 2018. Generally, courts recognize that a delay of one year is "presumptively prejudicial." *Id.* at 52-53. This does not mean that defendant was in fact prejudiced, however. *O'Quinn*, 339 Ill. App. 3d at 354. Rather, a "presumptively prejudicial" time period will only trigger the full *Barker* inquiry involving the aforementioned factors. *Id.*

¶ 82    Consequently, we next address the second *Barker* factor, the reason for the delay. The record shows that from March 2013 to October 2016 (when the parties finally agreed to a trial date of February 2017), defendant had engaged in heavy pretrial motion practice, filing a motion to suppress identification testimony, a motion to produce, and a motion to quash arrest and suppress evidence, among other things. Thus, while his time awaiting trial was uncommonly long, the record reveals that, during much of it, defendant was engaging in intentional motion practice aimed for his benefit. Analyzing the speedy trial claim from thereafter, it is significant that the delay in October 2016 was due in part to the limited availability of defendant's own expert witness and defense counsel's trial conflicts. In February 2017 (when trial had been set), the parties continued the case by agreement. The case was continued by agreement two to three more times before defendant moved for dismissal on speedy trial grounds in November 2017 and in February 2018, over 4½ years after he was arrested. Notably, at the November hearing, while demanding a speedy trial in one breath, in the other, defense counsel stated her own expert witnesses were not available until February 2018.

¶ 83    A delay is considered to have been occasioned by the defendant when his acts caused or contributed to the delay. *People v. Kaczmarek*, 207 Ill. 2d 288, 296 (2003); see also *O'Quinn*, 339 Ill. App. 3d at 355 (noting that a defendant is bound by his attorney's actions). Moreover, an agreement to continue the case is properly chargeable to the defendant. *Kaczmarek*, 207 Ill. 2d at 296. Here, the trial court denied defendant's speedy trial motions, finding that defendant, through his counsel, participated in or acquiesced to the delay up until November 2017, which is a determination the record certainly supports. Following that, the court itself was not able to try the case in February 2018.[11]

¶ 84    Moreover, defendant has not identified any deliberate attempt by the State for the delay. To the extent defendant asserts the delays were occasioned by the health of one State witness, a detective, that does not support a finding of ill-will by the State. See *Echols*, 2018 IL App (1st) 153156, ¶ 25 (noting that the unavailability of a witness is also a valid reason for delay). The State's nonspecific inability to procure Dear, its main witness, at various points in 2017 likewise does not support a finding of ill-will or deliberate delay. See *People v. Lacy*, 2013 IL 113216, ¶ 21 (inability to obtain the testimony of a material witness after due diligence is a valid reason for delay). While defendant argues the State failed to exercise due diligence in securing Dear as a witness, the record simply does not support this assertion, as much of it is silent on the details in the parties' efforts to procure witnesses. And, as the State notes, the record from May 2018 to July 2018 is not detailed enough to conclude the reason for the several continuances. Overall, we

---

[11]The State also answered that it was not ready for trial at the February 2, 2018, hearing and responded that it had "an out-of-state witness *** with issues, and there are other strategic reasons" that the State was not "privy to expose." The State later clarified that that it had been unable to procure the detective, rather than Dear. These comments betray the unavailability of a witness and vague statements as to strategy. While defendant reads ill-will into these comments, at most they betray some negligence.

cannot say this second factor involving the reason for the delay weighs in favor of defendant, when considered in its totality.

¶ 85    That brings us to the third consideration, whether in due course the defendant asserted his right to a speedy trial. As just set forth, defendant took an inordinately long time to assert his right to a speedy trial and only after having participated in or acquiesced to the delay, which does not weigh in his favor. See *Echols*, 2018 IL App (1st) 153156, ¶ 35 ("Typically, a failure to assert the right to a speedy trial weighs heavily against a defendant unless he or she was unaware of the charges."). In addition the defense first filed its written demand for trial on May 10, 2018.

¶ 86    The fourth and final consideration in the *Barker* analysis is prejudice to the defendant. Prejudice must be assessed in light of the interests of the defendant that the speedy-trial right was designed to protect. *Kaczmarek*, 207 Ill. 2d at 299. Those interests are (1) the prevention of oppressive pretrial incarceration, (2) the minimization of defendant's anxiety and concern about the pending charge, and (3) most importantly, the limitation of the possibility that the defense will be impaired by the delay. *Id.* The third factor is most serious, given that a defendant's inability to adequately prepare his case " ' "skews the fairness of the entire system." ' " *Id.* (quoting *Doggett*, 505 U.S. at 654).

¶ 87    Here, defendant has not specified how his ability to prepare his defense was impaired by the lengthy delay, other than that it unfairly enhanced the prosecution's cross-examination of Mulero with respect to defendant's whereabouts the day before the shooting, thereby undermining Mulero's alibi testimony. Defendant notes that Mulero's memory of the days *before* the shooting was indistinct and this discredited his testimony as to the day of the shooting. We would challenge that logic, since Mulero was interviewed by police around August 3, 2012, the

day of the shooting, as a result of defendant's first arrest and likely recalled that day better as a result. Thus, Mulero's inability to remember the days prior likely enhanced the defense.

¶ 88    Regardless, defendant has not demonstrated that, but for the delay, the State's line of questioning would have been unavailable previously or that Mulero otherwise would have better recalled events. As set forth, during much of the delay before trial, defendant was engaging in pretrial motion practice aimed at enhancing his defense. We see no proof of prejudice as to witnesses or evidence, yet we acknowledge "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655. Likewise, we acknowledge the prejudice naturally flowing from defendant's anxiety and concern over the pending charge, but we note "this factor is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." *Kaczmarek*, 207 Ill. 2d at 300.

¶ 89    Balancing all the stated factors in light of the record, we conclude that, although defendant's pretrial custody was uncommonly long, the total factors do not weigh in defendant's favor. While we do not condone the lengthy delay occasioned here, we likewise do not believe it qualifies as a constitutional violation warranting the severe remedy of outright case dismissal. See *O'Quinn*, 339 Ill. App. 3d at 356-57.

¶ 90                                    CONCLUSION

¶ 91    For the reasons stated, we reject defendant's speedy trial and sufficiency of the evidence claims. Nonetheless, we must reverse and remand the case for a new trial with various portions of the complained-of statements redacted from the videotaped interrogation. Given the State's evidence and the repetitive quality of many video statements from both the detectives and defendant, it would behoove the parties to redact the video accordingly. We also encourage the

parties to create a transcript of the videotape for accuracy and time-saving purposes. As the evidence was sufficient to allow a rational trier of fact to find defendant guilty beyond a reasonable doubt, double jeopardy does not bar a retrial. *Moore*, 2012 IL App (1st) 100857, ¶ 59.

¶ 92     Reversed and remanded.

---

**No. 1-19-0882**

---

| | |
|---|---|
| **Cite as:** | *People v. Davila*, 2022 IL App (1st) 190882 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-6742; the Hon. Nicholas R. Ford, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |

---